# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PAMELA RENEA GATLIN-STANTON,   )
   )
     Plaintiff,   )    Case No. 3:15-cv-00717
   )    Senior Judge Haynes
v.   )
   )
CAROLYN W. COLVIN,   )
Acting Commissioner of Social Security,   )
   )
     Defendant.   )

## MEMORANDUM

Plaintiff, Pamela Renea Gatlin-Stanton, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act.

Before the Court is Plaintiff's motion for summary judgment (Docket Entry No. 24) contending, in sum, that the Administrative Law Judge ("ALJ") erred by (1) failing to determine that Plaintiff's impairments met Listings 11.14 and 11.08, (2) assigning incorrect weight to the opinions of non-examining physicians Dr. Semerdjian and Dr. Freeman, (3) determining that Plaintiff's testimony was not credible, and (4) failing to mention Plaintiff's limitations in concentration, persistence, and pace in a hypothetical offered to the vocational expert. The Commissioner contends that the ALJ's decision is supported by substantial evidence. (Docket Entry No. 29). Plaintiff has also filed a reply in support of her original assertions. (Docket Entry No. 30).

After several hearings, the ALJ evaluated Plaintiff's claim for DIB and SSI using the sequential evaluation process set forth at 20 C.F.R. § 416.920. (Docket Entry No. 20, Administrative

Record at 28-29).[1] The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. Id. at 29.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 30, 2005, the alleged onset date of her disability. Id.

At step two, the ALJ determined that Plaintiff has the following severe impairments: lumbar degenerative disc disease and depression. Id. Further, the ALJ determined that Plaintiff had the following severe impairments as of October 1, 2011: peripheral vascular disease, cervical radiculopathy and carpal tunnel syndrome. Id. at 29-30.

At step three, the ALJ found that prior to October 1, 2011, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 30.

At step four, the ALJ determined that prior to October 1, 2011, Plaintiff had the residual functional capacity to perform light work, subject to occasional postural movements, including stooping, crouching, crawling, kneeling and balancing; no ladders, ropes or scaffolds; no slippery surfaces; and the need for simple, routine work, not involving public contact or more than occasional interaction with supervisors. Id. at 32.

At step five, the ALJ stated that Plaintiff is unable to perform past relevant work. Id. at 37. The ALJ concluded that prior to October 1, 2011, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. Id. The ALJ also determined that beginning on October 1, 2011, Plaintiff was disabled and continued to be disabled as of the date of

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

the decision. Id. at 40. Following this decision, Plaintiff requested a review, and on February 9, 2015, the Appeals Council denied Plaintiff's request for review. Id. at 10-14.

## A. Review of the Record

On April 22, 2005, Plaintiff visited Dickson Medical Associates for "med[ication] refills." Id. at 426. It was noted that Plaintiff was "still smoking." Id. Plaintiff's chronic problems were listed as "Hep[atitis] C, [hypertension] and Dep[ression]." Id. During a review of symptoms, it was noted that Plaintiff experienced fatigue, weight gain, back pain, muscle pain or cramps, joint pain/swelling, depression and paresthesia. Id. Upon examination, Plaintiff was noted to have a carotid bruit. Id.

On May 30, 2007, Plaintiff visited Nashville Gastrointestinal Specialists for evaluation of chronic Hepatitis C. Id. at 499. Plaintiff reported that she "has had hepatitis C for about 12 years. ... She is interested in treatment." Id. Plaintiff underwent screening tests and was scheduled for a liver biopsy. Id. The biopsy was conducted on June 13, 2007. Id. at 500.

On June 28, 2007, Plaintiff visited Nashville Gastrointestinal Specialists to discuss her liver biopsy. Id. at 501. Plaintiff was "doing okay overall without complaint." Id. Plaintiff's liver biopsy "revealed grade 1-2, stage 1 disease. She is genotype 2b with viral load of 3.1 million." Id. Plaintiff admitted that "[s]he used to abuse alcohol drinking a 12-pack a night. She tapered off over the past month and a half and has not had any alcohol for the past week." Id. Plaintiff also reported depression that was "stable" and a "1 out of 5 today." Id. Plaintiff's treatment plan was to start drug and alcohol screenings, and if Plaintiff had six months of negative screenings, "at that point we can initiate therapy." Id.

On January 4, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for initial

injection." Id. at 502. Plaintiff was "doing well overall. She has had six months of negative alcohol and drug screen and her eye exam. ... She is on Zoloft and stable. She denies any other complaints at this time." Id. Plaintiff received the "[i]nitial PEG injection." Id.

On January 18, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 503. Plaintiff was "doing fabulous overall. She had some body aches with her initial injection. Her second injection was a little better." Id.

On February 1, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for follow up." Id. at 504. Plaintiff was "doing great overall but [wa]s having some intermittent [headaches] and insomnia; otherwise she is going great on therapy." Id.

On February 29, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 505. Plaintiff complained of "ongoing problems with headaches. She also has rash. She has not tried any Aristocort Cream or any such treatment," so an Artistocort Cream was prescribed. Id.

On March 28, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 506. Plaintiff was "half way through therapy. She is doing great overall. She still has headaches from her ribavirin. She tried Ultram ER but it made her very nauseated. She also complains of bilateral leg numbness and tingling that lasts about ten minutes. She gets this every other day but when she gets it she cannot walk. She is not diabetic. If this is coming from her therapy it is a very rare side effect. The patient does not really want to dose reduce and would like to push on as much as possible." Id.

On May 2, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 507. Plaintiff was "doing quite well and has a negative viral load. She has a couple of months to go. She had some problems with leg tingling and burning. She apparently was placed on Neurontin

and received no benefit from this." Id.

On May 30, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 508. Plaintiff was "doing excellent on therapy. Her labs looked beautiful. She has been negative basically since month one. She still has some numbness and tingling in her extremities and Neurontin did not help. However, she states this is tolerable. She only has a few weeks left in therapy." Id.

On July 23, 2008, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 509. It was noted that Plaintiff "successfully completed her therapy six months on June 24th. She is gaining her strength back." Id.

On October 23, 2008, Plaintiff underwent an abdominal ultrasound that was "[n]ormal." Id. at 1000. On October 23, 2008, Plaintiff also visited Nashville Gastrointestinal Specialists "for followup." Id. at 510. Plaintiff was "doing great overall. She denies any complaints. She has been off therapy about four months." Id.

On October 31, 2008, Plaintiff visited Dickson Medical Associates for a "med ref[ills]" and complaining of "leg pain [right]." Id. at 418-19. Plaintiff experienced "bilat[eral] leg pain – thighs, post[erior] leg [and] butt muscle" that was "intermittent" and "moderate." Id. at 418. Plaintiff's chronic problems were listed as "Hep[atitis] C, [hypertension] and Dep[ression]." Id. During a review of symptoms, it was noted that Plaintiff experienced fatigue, back pain, depression and paresthesia. Id. Upon examination, Plaintiff was noted to have a carotid bruit, normal and equal muscle strength, a normal gait, intact cranial nerves, no mood abnormalities and no anxiety or depression. Id. Plaintiff was diagnosed with paresthesias legs, Hepatitis C, hypertension and a carotid bruit. Id. at 419. Plaintiff was scheduled for laboratory tests. Id.

On November 4, 2008, an ultrasound of Plaintiff's carotid bruit showed "[n]o hemodynamically significant carotid artery stenosis" and "[b]ilaterally antegrade" "[v]ertebral arteries." Id. at 421.

On December 15, 2008, Plaintiff's blood work showed "sugar elevated – but 3 mo[nth] [average] sugar is normal – bad chol[esterol] (LDL) is too high – watch diet." Id. at 423.

On January 9, 2009, Plaintiff visited Nashville Gastrointestinal Specialists "for followup." Id. at 511. Plaintiff "has been in remission for six months or more now. ... She is delighted and denies any complaints whatsoever." Id.

On April 22, 2009, Plaintiff visited Dickson Medical Associates. Id. at 427. It was noted that Plaintiff "feels well except for legs [and] thighs [and] all over starts at low back." Id. Plaintiff was diagnosed with paresthesias legs, Hepatitis C, hypertension and fatigue. Id. Plaintiff was referred for a nerve study. Id.

On May 5, 2009, Plaintiff visited Dickson Medical Associates and was evaluated as a "new patient." Id. at 428-30. Plaintiff complained of "[lower extremity] pain, numbness, and tingling. [Plaintiff] has been on Neurontin and Tramadol x about 1 year for discomfort. Patient has not ever seen a change with these medications. Symptoms present daily described as severe." Id. at 428. Plaintiff reported as her past medical history "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. Plaintiff listed her current medications as Metoprolol, a beta blocker, Gabapentin, a nerve pain medication, Sertraline, a selective serotonin reuptake inhibitor (SSRI) for depression, Promethazine, an antihistamine, Zolpidem, an insomnia medication, and Tramadol, a narcotic pain medication. Id. Plaintiff reported "no history of tobacco use" and "[n]o history of depression." Id. at 428-29. Plaintiff's cranial nerves were tested and found

6

to be intact and normal. Id. at 430.

Plaintiff was diagnosed with "numbness" that "started 4-08. On tramadol and neurontin without relief. Constant. ... [Thyroid test] normal. [N]umbness radiates from buttocks into the ankles and legs give out. Fallen a few times. Needs rest to regain strength. [Negative for] low back pain. [Positive for] burning behind the knees." Id. The treatment for this condition was to undergo several tests and to stop Neurontin and "consider lyrica in place." Id. Plaintiff was also diagnosed with hypertension and "lumbago nonvertebral (nondiscogenic)." Id.

Plaintiff underwent a lumbar spine radiograph the same day. Id. at 431. This test showed "[d]egenerative changes of the lumbar spine. No actute fracture or malalignment. No dynamic instability." Id.

On May 18, 2009, Plaintiff underwent an MRI of her lumbar spine to "rule out [herniated nucleus pulposus]." Id. at 432. The MRI showed "degenerative joint and disc disease of the [lumbosacral] spine maximal at L3-L4 with moderate right foraminal stenosis due to joint inflammation and mild on the left due to joint hypertrophy" and "straightening of the lumbar lordosis secondary to muscle spasm." Id.

On May 20, 2009, Plaintiff visited Dickson Medical Associates "for Ansar testing, EMG testing. Ansar today due to hypertension. Strong family history of [diabetes mellitus]. Emg today due to [lower extremity] pain, numbness and tingling – present daily at a severe level." Id. at 435-37. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 435. Plaintiff's current medications were listed as Metoprolol, a blood pressure medication, Sertraline, an SSRI for depression, Promethazine, an anti-histamine, Zolpidem, an insomnia medication and Tramadol, a narcotic pain medication;

7

Plaintiff was prescribed Lyrica, a nerve pain medication used to treat fibromyalgia and Plaintiff's prescription for Gabapentin, another nerve pain medication, was discontinued. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. at 436. Upon examination, Plaintiff's gait was "flat-footed and off on tandem." Id. at 436.

Plaintiff was diagnosed with "numbness" and it was noted that a "5-09 [lumbosacral] spine [finite element] showed degenerative changes. EMG showed sciatica, right greater than left. MRI of [lumbosacral] spine showed joint disease at L3-L4. Neurontin, lyrica did not help." Id. The treatment plan for this was "[physical therapy] first. Cymbalta now. Consider [epidural steroid injections] at both joints at L3-L4 vs L5-S1 disc injection." Id. Plaintiff was also diagnosed with hypertensio, with a note that the ANSAR test Plaintiff underwent that day "was good," "lumbago nonvertebral (nondiscogenic)," and "neuropathy peripheral autonomic idiopathic" with another note that the ANSAR test "was good." Id. at 436-37.

On May 20, 2009, Plaintiff underwent an electromyography test due to complaints of lower extremity pain, numbness and tingling. Id. at 433-34. The "[n]erve conduction studies revealed bilateral prolonged H reflexes. F waves were normal. Needle exam revealed denervative changes in both AT, lateral gastrox muscles, right LS PS muscles." Id. at 434. A handwritten note says "does she want to try PT?" and another says "Dr. Vera Huffnade has ordered PT – [Plaintiff's] first app[ointment] 5/26/09." Id.

On June 3, 2009, Plaintiff visited Dickson Medical Associates "for recheck. [Plaintiff] comes with the diagnosis of lumbar radiculopathy. Labs order at last visit – available for review. Has been to [physical therapy] – [physical therapy] is making pain worse. Has went now x3 (today being 3rd

8

visit). Is taking Cymbalta 60mg – no change in pain or emotions." Id. at 442-44. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 442. Plaintiff's current medications were Metroprolol, a beta blocker, Sertraline, an SSRI for depression and Zolpidem, an insomnia medication; Plaintiff's prescriptions for Lyrica, a nerve pain medication for fibromyalgia, Promethazine, an antihistamine and Tramadol, a narcotic pain medication, were discontinued and Plaintiff was given a new prescription for Cymbalta, an anti-depressant and nerve pain medication. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. at 443. Upon examination, Plaintiff's gait showed an "[a]ntalgic gait favoring the left, antalgic gait favoring the right. [Positive for] flat-footed and off on tandem. [Positive for] stiff." Id. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and numbness with a note that Plaintiff received "Interferon treatment for hepatitis in 1-08 to 6-08 and symptoms started then and have gotten worse." Id. The plan for Plaintiff's numbness was to "[c]onsider [epidural steroid injections] at L5-S1 disc injection. Pristiq and ultram. If no help, tegretol next. Consider [epidural steroid injections] at both L3-L4 joints." Id. at 444.

On June 8, 2009, Plaintiff underwent a lumbar epidural steroid injection in L5-S1 due to her history of sciatica. Id. at 445. This was a "[s]uccessful lumbar epidural steroid injection under fluoroscopic guidance." Id.

On June 22, 2009, Plaintiff visited Dickson Medical Associates "for recheck. Here following [epidural steroid injection] on 6/8/09. [Plaintiff] reports that had some relief from [epidural steroid

9

injection] 2 days after injection. Pain in back is now more dull. But has more pain in [lower extremities] and more muscle spasms in legs." Id. at 446-48. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 446. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression, Zolpidem, an insomnia medication and Cymbalta, an anti-depressant and nerve pain medication. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. Upon examination, Plaintiff had "[l]eft lower extremity strength [of] 4/5" and Plaintiff's gait showed an "[a]ntalgic gait favoring the left. [Positive for] flat-footed and off on tandem. [Positive for] stiff." Id. at 447. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and numbness and the treatment plan was to "[c]onsider Pristiq and ultram. If no help, tegretol next. [Epidural steroid injections] at both L3-L4 joints. If persists, NS consult for myelogram?" Id. at 447.

On July 6, 2009, Plaintiff underwent a lumbar epidural steroid injection in L3-L4 due to her history of sciatica. Id. at 449. This was a "[s]uccessful lumbar epidural steroid injection under fluoroscopic guidance." Id.

On July 16, 2009, Plaintiff underwent an abdominal ultrasound that was "[n]ormal." Id. at 1001. Plaintiff also visited Nashville Gastrointestinal Specialists "for followup." Id. at 512. Plaintiff was "doing well overall. She denies any complaints today. She is one year off Hep C therapy." Id.

On July 20, 2009, Plaintiff visited Dickson Medical Associates "for recheck. Recent

[epidural steroid injection] on 7-6-09. No improvement following this [epidural steroid injection]. Pain seems the same to slightly worse." Id. at 450-52. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 450. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression, Zolpidem, an insomnia medication, Cymbalta, an anti-depressant and nerve pain medication and Skelaxin, a muscle relaxant. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. Upon examination, Plaintiff had "[l]eft lower extremity strength [of] 4/5" and Plaintiff's gait showed an "[a]ntalgic gait favoring the left. [Positive for] flat-footed and off on tandem. [Positive for] stiff." Id. at 451. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment plan was "[epidural steroid injection] of L5-S1 disc with 2 days of improvement and increased [lower extremity] pain. Pristiq causes sweating. 7-09 [epidural steroid injection] #2 of translaminar L3-L4 without help. Skelaxin did not help with cramping, but has not repeated itself. Continue Pristiq and ultram for two more weeks. If no help, tegretol next. NS consult for myelogram?" Id. at 451-52.

On August 11, 2009, Plaintiff visited Dr. Khan W. Li for a consultative examination. Id. at 489-90. Plaintiff reported "a one-year history of lower extremity pain. She states that she has pain that goes down both legs, both the front and the back of her legs and to the bottom and tops of her feet. This pain consists mostly of a burning sensation. She also reports some occasional stabbing pain and sensation of paresthesias. These equally affect the left and the right leg. She has a small

component also of low back pain, but the primary complaint is really the leg pain." Id. at 489.

Plaintiff stated that walking worsened her pain, and that she "can walk for only about 10 minutes at a time before the onset of pain." Id. Plaintiff stated that previous treatments included physical therapy, an exercise program, anti-inflammatory medications, nerve blocking medications, narcotic medications, steroids and epidural steroid injections, and despite these treatments rated her pain currently as an eight out of ten. Id. Upon examination, Plaintiff's "gait [wa]s within normal limits" and her "physical exam [wa]s unremarkable." Id.

Plaintiff brought a copy of an MRI of her lumbar spine that Dr. Li reviewed. Id. Dr. Li observed "a little bit of degenerative disease at L3-4 with some very, very mild disc desiccation and some posterior facet arthropathy. Otherwise, I believe this MRI is completely normal for her age. I do not see any significant neuroforaminal or central stenosis. She actually has beautifully well-maintained disc heights and hydration. There is good maintenance of lumbar lordosis. I really do not see anything on this MRI to explain her lower extremity symptoms." Id. at 489-90. Dr. Li "had a long discussion with [Plaintiff] regarding her peripheral neuropathy and her neuropathic-type pain. She states that this really started after she started undergoing treatment for hepatitis C with peginterferon. I am not very familiar with the interferon medications, but I do know that some of them can cause a peripheral neuropathy, and given the timing of her infusion I suspect that this is the cause. I certainly do not think there are any surgical interventions necessary for treatment of her lower extremity pain. Her MRI is essentially normal." Id. at 490.

On August 17, 2009, Plaintiff visited Dickson Medical Associates "for recheck. No change in back pain. Continuing Pristque – but found not change with Ultram, so has [discontinued] this." Id. at 453-55. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia,

neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 453. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Pristiq, an anti-depressant. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. Upon examination, Plaintiff's gait showed an "[a]ntalgic gait favoring the left, antalgic gait favoring the right. [Positive for] flat-footed and off on tandem. [Positive for] stiff." Id. at 454. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment notes stated "Neurontin, lyrica, cymbalta, pristiq, ultram did not help. ... Dr. Li thought myelogram and surgery not option. Can only walk 50 feet and then legs will give out. Stop Pristiq and ultram. Start tegretol, consider savella. Consider pain clinic referral if persists next time. Arthritis profile next time." Id.

On October 5, 2009, Plaintiff visited Dickson Medical Associates "for recheck. [Plaintiff] last seen 8-17-09 – was tried on Tegretol. [Plaintiff] took medication x 4 weeks but had no change in symptoms. Has now [discontinued] Tegretol." Id. at 456-58. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 456. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Pristiq, an anti-depressant. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. Upon examination, Plaintiff's gait was "intact. [Positive for] flat-footed and off on tandem. [Negative for] stiff." Id. at 457. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with

another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment notes stated "Dr. Li thought myelogramand surgery not option. Can only walk 50 feet and then legs will give out. Start savella. Consider pain clinic referral if persists next time. Arthritis profile." Id.

On January 18, 2010, Plaintiff visited Dickson Medical Associates "for recheck. Started on Savella at last visit on 10-05-09. Doing well – feels like Savella has helped more than previously tried medication." Id. at 459-61. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 459. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Savella, an anti-depressant and nerve pain medication. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. Upon examination, Plaintiff's gait showed an "[a]ntalgic gait favoring the left, antalgic gait favoring the right. [Positive for] flat-footed and off on tandem." Id. at 460. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment notes stated "1-10 had increased jitteriness with zoloft and 40% improvement with pain. Status: Improved. Plan: Increase savella to 100mg [twice per day], decrease and stop zoloft. Presumed fibro[myalgia] as diagnosis. Consider Steigelfest or pain clinic referral if persists next time. Arthritis profile." Id. at 460-61.

On May 19, 2010, Mark Petro, Ph.D. completed a psychological assessment. Id. at 396-401. Upon observation, Dr. Petro wrote that Plaintiff's "motor/gait was unremarkable" and that "[t]his

examiner estimated that [Plaintiff] was in the low-average range of intellectual functioning. Her affect ranged from appropriate to blunted to topics. This examiner found [Plaintiff] to demonstrate good judgment and insight." Id. at 396. Plaintiff reported that "her last employment was with the Tennessean of Nashville, Tennessee from 1978 to 2005 working in a warehouse until she was fired following her breaking some employer rules. She stated the primary physical demand of the job was lifting and the mental demand was minimal. She claimed her longest employment was for 28 years. She stated she has had approximately 'five to ten' jobs in her lifetime and stated she was fired on one occasion. She claimed she has not worked since her last employment as 'adopted kids in 2006, my liver.'" Id. at 397. Plaintiff "denied any inpatient treatment history remarkable for psychological, emotional, or behavioral problems." Id. at 398. Plaintiff "stated that a good day over the past six months involved 'extra company (people).' She claimed that a bad day over the past six months involved 'sleep.'" Id.

During the mental status evaluation, Plaintiff "claimed her predominant mood over the past two weeks has been 'happy.' She stated she is generally happy in life." Id. Plaintiff also "endorsed the depressive symptoms of insomnia and fatigue which she stated had been over the past two decades related to working night shifts. She stated she had trauma to her head as a result of being hit by a car at her age of 14 that left her rendered unconscious. She denied any problem with perceived excessive worry 'No, not really.' She denied any history of problems with obsessive-compulsive behaviors, panic attack symptoms, or hypomanic/manic symptoms. She stated she has frequent intrusive thoughts related to 'my legs (pain that began four years ago).'" Id. at 399.

Plaintiff described her activities of daily living:

[Plaintiff] made multiple references to change in her activities approximately four

years ago which she stated was when started treatment for "my liver." She denied any significant involvement in shopping of recent. She stated she made her last independent purchase six months ago. She claimed she was more involved in shopping nine years ago. She claimed she is involved in cooking "maybe three (days per week), microwave." She claimed she had greater involvement in cooking approximately four years ago. [Plaintiff] denied any involvement in housecleaning. She stated she had greater involvement in housecleaning activities approximately four years ago. She stated she has a driver's license with the only restriction being for corrective lenses. She stated she last drove "maybe six months ago Christmas." She stated the primary place she frequents when she leaves home is "my mother's." She reported greater involvement in activities outside her home approximately six months ago. She stated she handles her own hygiene and self-care needs. She claimed her primary recreational activities were "read, be with my kids." She described greater involvement in hobbies and recreational activities approximately four years ago. [Plaintiff] denied any difficulty interacting with others and denied any problems being around children.

Id.

Dr. Petro diagnosed Plaintiff with "Major Depressive Disorder, recurrent, in partial remission (rule out)" and "[r]eported fibromyalgia." Id. Dr. Petro concluded:

This examiner estimated that [Plaintiff] was in the low average range of intellectual functioning. She may demonstrate mild difficulty in her ability to consistently understand and remember complex instructions, directions, and procedures within the work environment.

She may demonstrate mild-to-moderate difficulty in her ability to exhibit sustained concentration and persistence for making complex work-like decisions within the work setting. She may demonstrate mild-to-moderate difficulty in her ability to persist during work days without interruptions from psychological symptoms. She may demonstrate occasional mild difficulty in her ability to consistently and appropriately interact with the general public and with various personnel within the worksite. She may demonstrate occasional mild difficulty in her ability to consistently and appropriately respond to changes in the job schedule on an independent basis. She may demonstrate mild difficulty in her ability to consistently and appropriately take needed precautions against recognized hazards within the job setting.

Id. at 399-400.

On July 16, 2010, Plaintiff underwent an abdominal ultrasound that was "[n]ormal." Id. at

1002. Plaintiff also visited Nashville Gastrointestinal Specialists "for followup." Id. at 513. Plaintiff was returning nearly two years after treatments for Hepatitis C. Id. Plaintiff was "doing well overall. She denies specific problems." Id.

On September 9, 2010, Plaintiff completed a questionnaire at Family Health Care of Hendersonville. Id. at 415-16. Plaintiff wrote that she had the following problems: trouble sleeping, falls or stumbling, with "x2" written beside it, calf/leg pain, ankle swelling, stiffness in muscles, muscle aches, nausea, poor balance, and tingling, numbness, or weakness in hands or feet. Id. at 415. In "family history," Plaintiff wrote that she had a history of Hepatitis and high blood pressure, and that she had a family history of diabetes, depression, cancer (any kind) and high blood pressure. Id. at 416. Plaintiff admitted she smoked a "pack a week" and drank "1 or 2 [per] month." Id. Plaintiff listed her current medications as Diazepam, an anti-anxiety, Metoprolol, a beta blocker, Zolpidem, an insomnia medication, Phenergan, an antihistamine, Sertraline, an SSRI for depression and Tramadol, a narcotic pain medication. Id. Plaintiff also wrote at the end, "Fibromyalgia in my legs." Id.

On September 13, 2010, Plaintiff visited Dickson Medical Associates "for recheck. Doing well. Last seen 1/18/[10]. Has has discontinued Savella – now on Zoloft 100mg [by mouth] [three times per day]." Id. at 463-65. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 463. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Valium, an anti-anxiety sedative. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff stated she experienced numbness, specifically, "falling a little bit more with increased numbness. Savella caused irritability. Needed to switch back to zoloft." Id. Plaintiff stated that her

17

symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. at 464. Upon examination, Plaintiff had "[l]eft lower extremity strength [of] 4/5" and Plaintiff's gait showed an "[a]ntalgic gait favoring the right. [Positive for] flat-footed and off on tandem." Id. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment plan was to "[c]ontinue zofloft. Steigelfest consult for [positive for] [rheumatoid arthritis]." Id. at 464-65.

On October 19, 2010, Plaintiff visited Vanderbilt's Rheumatology clinic. Id. at 492-95. Plaintiff reported fatigue, nausea and/or vomiting, joint swelling, muscle pain, numbness and/or tingling, sleep problems and depression. Id. at 492. Plaintiff rated her pain at an eight out of ten and her fatigue at a five out of ten. Id. Plaintiff admitted to smoking, although the note says "2wk packs per day." Id. at 493. Plaintiff stated that she was "having pain all over in her muscles, burning pain, inactivity helps, no trauma, sometimes swelling in her right knee and ankle." Id. at 494. At this point, Plaintiff rated her pain at a nine out of ten and "constant." Id. Plaintiff also reported "[s]tiffness in the [morning] 15 minutes." Id. Despite claiming both sleep problems and depression earlier, Plaintiff now claimed she "[d]oes sleep well, no depression, and is exercising." Id. Plaintiff reported her current medications as Diazepam, an anti-anxiety, Metoprolol, a beta blocker, Phenergan, an antihistamine, Sertraline, a selective serotonin reputake inhibitor (SSRI) and a topical pain cream. Id. Plaintiff's treatment plan included "assurance she does not have [rheumatoid arthritis] at this time," an instruction to do home back exercises for suspected "[osteoarthritis] of L-spine," Elavil, an anti-depressant and nerve pain medication, and an "anti-CCP" or anti-cyclic citrullinated peptide antibody, a test to rule out rhuematoid arthritis. Id. at 495.

18

On October 25, 2010, Plaintiff visited Dickson Medical Associates "for recheck. [Plaintiff] last seen 8/16/10 – had a visit with Dr. Steigelfest. 11 lb weight loss since last visit – changing eating habits. Dr Steigelfest recommended starting Elavil – has not started to date." Id. at 466-68. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 466. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Valium, an anti-anxiety sedative. Id. Plaintiff reported "no history of tobacco use." Id. Plaintiff reported on her diagnoses: hypertension was "not a problem. Low BP now," regarding rheumatoid arthritis "Dr. Steigelfest did not believe [Plaintiff] at [rheumatoid arthritis], but osteoarthritis and neuropathy. Recommended elavil stat. Will see again in November. [Positive for] weight loss," and regarding lumbago, Plaintiff had "good and bad days." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. at 467. Upon examination, Plaintiff had "[l]eft lower extremity strength [of] 4/5" and Plaintiff's gait showed an "[a]ntalgic gait favoring the right. [Positive for] flat-footed and off on tandem." Id. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the ANSAR test "was good;" hypertension, with another note that the ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment plan was "[c]onsider elavil as recommended. Flector patch trial for now. [Follow up] with Dr. Steigelfest. Consider lidoderm patch script next time if flector doesn't work. Has tried samples and helps right knee pain. TNS did not help previously." Id. at 468.

On November 22, 2010, Plaintiff visited Dickson Medical Associates "for recheck. Here for Ansar and follow up after trial of Flector Patch." Id. at 469-71. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take

phenergan." Id. at 469. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Valium, an anti-anxiety sedative. Id. Plaintiff reported "no history of tobacco use." Id. During a review of Plaintiff's diagnoses, it was noted regarding Plaintiff's neuropathy that the "11-10 ANSAR [wa]s good," her hypertension was under "good control," and her lumbago had "good and bad days. Flector patch did not help significantly." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. at 470. Upon examination, Plaintiff had "[l]eft lower extremity strength [of] 4/5" and Plaintiff's gait showed an "[a]ntalgic gait favoring the right. [Positive for] flat-footed and off on tandem." Id. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the most recent ANSAR test "was good;" hypertension, with another note that the most recent ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" that the treatment notes stated was "stable" and the treatment plan was "lidoderm patch first, if no help start elavil taper. [Follow up] with Dr. Steigelfest. B12 and vitamin D level next time." Id. at 471.

On December 14, 2010, Plaintiff visited Family Health Care of Hendersonville complaining of "[s]inus cong[estion], runny nose, prod[uctive] cough, clear cough worse" and stated that she "wants [prescription]." Id. at 410. Plaintiff was prescribed a Z-pack, an anti-infection medication. Id.

On January 24, 2011, Plaintiff visited Dickson Medical Associates "for recheck. No[t] much change noticed since last visit. No change with Lidoderm patch." Id. at 472-74. Plaintiff's past medical history was listed as "[h]ypertension, depression, insomnia, neuropathy, Hepatitis C. Sensitive stomach – take phenergan." Id. at 472. Plaintiff's current medications were Metoprolol, a beta blocker, Sertraline, an SSRI for depression and Valium, an anti-anxiety sedative. Id. Plaintiff

reported "no history of tobacco use." Id. During a review of Plaintiff's diagnoses, it was noted that her hypertension was under "good control," her lumbago "continues to fluctuate" and her numbness "[r]emains with burning and dead feeling, occasional pins and needles sensation." Id. Plaintiff stated that her symptoms were "back pain," "tingling sensations, numbness, 'pins and needles' sensation[.]" Id. at 473. Upon examination, Plaintiff's gait was "intact" but Plaintiff was "[positive for] flat-footed and off on tandem." Id. Plaintiff was diagnosed with "neuropathy peripheral autonomic idiopathic," with a note that the most recent ANSAR test "was good;" hypertension, with another note that the most recent ANSAR test "was good;" "lumbago nonvertebral (nondiscogenic);" and "numbness" and the treatment plan was to "[s]tart elavil taper. [Follow up] with Dr. Steigelfest. B12 and vitamin D level." Id. at 474.

On February 18, 2011, Plaintiff applied for DIB and SSI with an alleged onset date of January 1, 2006. Id. at 201-07, 208-15. On February 25, 2011, Plaintiff modified her onset date to December 30, 2005. Id. at 220. An undated disability report completed by Plaintiff noted that she last worked on May 1, 2005 and stopped because "I was fired for not following orders at work." Id. at 221-27.

On March 21, 2011, Rebecca Sweeney, Ph.D. completed a "medical consultant analysis." Id. at 1108-1112. Dr. Sweeney wrote that Plaintiff's record was insufficient, and that "according to procedures to expedite mental case processing, will need 23 letter from [treating physician] (Dickson Medical Associates) before able to rate as non-severe." Id. at 1108, 1111.

On March 30, 2011, Dr. Donita Keown conducted a consultative evaluation of Plaintiff. Id. at 479-87. Plaintiff reported her history:

> [Plaintiff] is a 50-year-old white female who was diagnosed with fibromyalgia two and half years ago. She is plagued by daily joint and muscle pain, fatigue, and poor sleep. She goes on to explain that she started developing burning, tingling, and

21

shooting pains into the bilateral lower extremities when she started using interferon two and half years ago to treat hepatitis. She says nerve condition studies were positive for neuropathy. She is not improved with the medications prescribed specifically to aid in managing her neuropathy i.e. Valium and tramadol per the statement. On reviewing the chart, the medical note from her treating physicians differed from the history which she provided today. She goes on to complain of ongoing pain attributed to neuropathy covering both lower extremities. She does not make a complaint of lower back pain. She attributes all of her lower limb complaints to neuropathy indicating that one of the local neurologists saw the same thing on the nerve conduction studies.

Id. at 479.

Plaintiff's current medications were listed as Metoprolol, a beta blocker, Tramadol, a narcotic pain medication, Diazepam, an anti-anxiety, Promethazine, an antihistamine, Sertraline, an SSRI for depression and Flector, an anti-inflammatory. Id. at 479-80. Plaintiff admitted to smoking a "[h]alf pack a day ... for 25 years." Id. at 480. Plaintiff reported her prior work history as "worked as a manger of a newspaper factory for 23 years, ending in 2005." Id.

Upon examination, Plaintiff's "[j]oints move with ease. ... Full range of motion is recorded in the hips, knees, ankles, feet, shoulders, elbows, wrists, and hands. There is no reaction or point tenderness at sites associated with fibromyalgia." Id. Plaintiff had an "[u]nremarkable toe-lift, heel-walk, one-foot stand, and Romberg's test. [Plaintiff] showed no difficulty getting up from the chair. She uses no handheld assistive device." Id. at 481. Dr. Keown's impression was that Plaintiff had a "[r]emote history of hepatitis C, status post interferon treatment, in remission since 2009 per claimant," "[b]ilateral lower extremity complaints, described in a manner inconsistent with sensory neuropathy and inconsistent with lumbar spine joint disease or radiculopathy" and "[m]ultijoint arthralgia without evidence of joint inflammation or reduced range of motion." Id.

Dr. Keown also completed a medical source statement. Id. at 482-87. Dr. Keown opined that

Plaintiff would be limited to "frequently" lifting and carrying fifty-one to one hundred pounds and "frequently" carrying twenty-one to fifty pounds. Id. at 482. Dr. Keown restricted Plaintiff to sitting for two hours at a time, for a total of eight hours, and to standing and walking for one hour at a time for a total of seven hours. Id. at 483. Plaintiff was limited to "frequently" operating foot controls, climbing stairs and ramps, climbing ladders or scaffolds, stooping, kneeling, crouching and crawling. Id. at 484.

On April 29, 2011, Dr. Marvin Cohn completed a physical residual function capacity assessment (RFC). Id. at 1114-1122. Dr. Cohn listed as Plaintiff's primary diagnosis fibromyalgia, her secondary diagnosis as hypertension, and her other alleged impairments as hypertension, Hepatitis C, and "[gastrointestinal] [symptoms]." Id. at 1114. Dr. Cohn limited Plaintiff to lifting and carrying fifty pounds occasionally and twenty-five pounds frequently, standing and walking for about six hours in an eight-hour workday, sitting about six hours in an eight-hour workday, and pushing and pulling that was limited in Plaintiff's lower extremities due to "bilateral [lower extremity] foot controls to frequent due to leg pains [with] standing, origin not clear." Id. at 1115. Dr. Cohn restricted Plaintiff to never climbing ladders, ropes, or scaffolds and occasionally climbing ramps and stairs. Id. at 1116. Dr. Cohn wrote, "[t]here is no clear basis for the alleged leg [symptoms]/limitations imposed by these [symptoms] and fibromyalgia appears reasonable as major or contributing cause." Id. at 1119. In conclusion, Dr. Cohn wrote, "[n]o confirmation of [diagnosis] for fibromyalgia tho[ugh] [symptom] description is suggestive. No nonphysical or exercise/[physical therapy] program for [treatment] of suspected fibromyalgia. Apparently no current symptoms from Hep[atitis] C. No significant weight loss due to stomach sensitivity and no complications from insomnia. No [congestive heart failure] or [end organ damage] due to

[hypertension]." Id. at 1121.

In an undated follow up report to SSA, Plaintiff stated that "[t]he walking has gotten worse. On bad depression days, she will spend the whole day in bed. This happens about 2 times a week. She takes at least one nap a day if not more because of the fatigue and nausea" and this change occurred in "June 2011." Id. at 256-61. Plaintiff stated that "[d]epression is worse – having depression bouts that keep her in bed [average] 2 days per week. Still fatigued. Cannot sleep through the night. Takes 2 to 3 naps per day, of 1 or 2 hours each, usually from [] 9 to 10 or 11am, 1 or 1:30 to 2:30 or 3. Can skip one of her naps, but can't go all day without any nap at all. Still nauseous. Vomiting once per day on average. Difficult to stand more than 5 minutes on her feet, after that her feet begin to burn and sting. Her legs will sometimes give out while walking and she will fall to the ground with no warning. Painful to walk even to the mailbox," also beginning in "June 2011." Id. at 256-57. Plaintiff stated that her condition affected her because on "[a]verage 2 days per week she has bouts of depression, where she stays in bed all day, stays in her jammies, won't eat or answer the phone or open her mail. Won't read, which is usually what she likes to do. ... Doesn't run[] errands due to leg weakness and pain; her husband does errands and grocery shopping. Doesn't vacuum or scrub floors or bathroom due to leg weakness and stinging pain. Requires breaks during light chores like cleaning windows. Husband does most of the cleaning. She is only makes simple microwave meals; husband does most of the cooking. Unable to carry laundry basket. She may fold clothes while sitting on the couch. Limits driving because legs go 'dead,' concerned about safety while driving." Id. at 259.

On June 22, 2011, Rebecca Sweeney, Ph.D. completed another "psychiatric review technique." Id. at 1124-36. The assessment was dated December 20, 2005 to June 22, 2011. Id. at

24

1124. Dr. Sweeney based her opinion on Plaintiff's "affective disorder," specifically "major depressive disorder, recurrent, in partial remission[.]" Id. at 1124, 27. Dr. Sweeney assigned Plaintiff one mild limitation in "difficulties in maintaining concentration, persistence, or pace." Id. at 1134. Dr. Sweeney concluded, "[Plaintiff's] statements are credible because the diagnosis of major depressive disorder, recurrent, in partial remission (rule/out) could reasonably produce the stated symptoms and functional limitations. The severity of her symptoms alleged is not inconsistent with the objective findings. The functional limitations described by the claimant do demonstrate consistency throughout the case record." Id. at 1136. Dr. Sweeney also noted that "the [consultative examiner] panelist is the only acceptable source in the file to give a medical source opinion. Although he suggested mild-to-moderate impairment in [concentration, persistence, and pace], the totality of the evidence indicated no more than mild restrictions in claimant's ability to perform work related tasks due to mental health problems. Most of her limitations appear related to her physical problems and pain. [Medically determined impairment] is not severe." Id.

On June 24, 2011, Nicholas Page completed a vocational analysis worksheet. Id. at 250-53. Page limited Plaintiff to lifting and carrying fifty pounds maximum and twenty-five pounds frequently, standing, walking and sitting for six hours in a day, and restricted pushing and pulling in her legs. Id. at 250. Page limited Plaintiff to never climbing ladders, ropes, or scaffolds and to occasionally climbing ramps and stairs. Id.

On June 28, 2011, Plaintiff's claim was denied on initial review. Id. at 125-29. On August 11, 2011, Plaintiff filed for reconsideration. Id. at 134-37.

On August 12, 2011, Plaintiff underwent an abdominal ultrasound that showed "[d]iffuse fatty infiltration, liver." Id. at 1003. Plaintiff also visited Nashville Gastrointestinal Specialists for

a three year follow up. Id. at 514. Plaintiff was "doing well overall. She denies any complaints." Id.

On September 13, 2011, Donald Stanton, Plaintiff's husband, completed a "third party function report." Id. at 304-11. Stanton wrote that Plaintiff was limited by her condition "on the time she can stand on her legs meaning I do cooking cleaning etc. Normal family out[]ings is out of the question." Id. at 304. Stanton described Plaintiff's daily activities as "makes coffee, sees the kids off to school, start breakfast then I take over, while she rests. She tries as much she can on day to day chores which I finish and she rests." Id. at 305. Stanton wrote that Plaintiff was able to "live a normal life" before her condition and that "not being able to walk long changes everything." Id. Stanton described Plaintiff's problems sleeping as "she sleeps hour at a time, cat naps." Id. Stanton wrote that he helped Plaintiff dress, helped her in and out of the bathtub, and reminded her to take her medication because "she has too many to take." Id. at 305-06. Stanton wrote that Plaintiff can "start" cooking, but he finishes and that he does the chores because "she cannot stand on her feet for very long." Id. at 306-07. Stanton wrote that Plaintiff went outside a "few times during week" but did not go out alone because it "hurts to spend time standing" and did not drive because it "hurts to use her legs." Id. at 307. Stanton wrote that Plaintiff's hobby was watching TV for a "few hours," but that "she lost being able to do anything" she could do before her condition began. Id. at 308. Stanton wrote that Plaintiff was limited in lifting, squatting, bending, standing, walking, kneeling, stair climbing and completing tasks because she "cannot use her legs for very long." Id. at 309. Stanton estimated that Plaintiff could walk a "very short distance" before needing to rest for "depends 20 minutes or so." Id. Stanton noted that Plaintiff's medications make her feel "sick at stomach, dizzy, weak, tired." Id. at 311. Stanton concluded, "[a]s you can see, and have heard from

26

her [doctors] she cannot do anything that you enjoy[.] Makes people think about what they have[.] Pain and suffering every day, but still in good spirits." Id.

Plaintiff also completed a function report. Id. at 242-48. The function report is undated, but was completed before Plaintiff married Stanton as her previous married name, Gatlin, is listed. Id. at 242. Plaintiff wrote that she "can not stand or walk very long." Id. Plaintiff wrote that her daily activities included "(with help) to bathroom, to eat, to living room, help kids get ready for school, help with dinner then to bed." Id. at 243. Plaintiff wrote that her husband cooked for the children and helped to cook and clean. Id. Plaintiff wrote that she was "waking up all hours of the night with much pain." Id. Plaintiff wrote that she could cook with help but that it took "15 to 30 min" and she "can not stand to cook need help cooking," and that regarding chores she could "wipe things down and I do fold clothes ... every day." Id. at 244. Plaintiff wrote that she went outside "1 to 2 times a week," that she went out sometimes alone but "mostly with help," and that she did not drive because "when my legs hurt, I can not drive, my legs go num[b]." Id. at 245. Plaintiff wrote that she was limited in squatting, bending, standing, walking, sitting, kneeling and stair climbing because "I can not stand on my legs for long periods of times." Id. at 247. Plaintiff wrote that she could walk for "5 steps" before needing to rest for "3 to 5 min." Id. Plaintiff also noted that she "sometimes" used a cane "when outdoors." Id. at 248.

On September 26, 2011, Plaintiff visited Dr. Jeffrey Gindorf at an office in Algonquin, Illinois. Id. at 536-38. Plaintiff stated that she "just moved from Tennessee to area needs new [doctor] in area. Needs someone to car[e] for fibromyalg[ia]. Apparently has pain and numbness in feet that is transient has occurred while driving and is brief, is taking multiple medications for this. Has been on numerous diazepines and pain medications." Id. at 537. Plaintiff reported a history of

hypertension, fibromyalgia that "started after Interferon treatment" and Hepatitis C in remission. Id. Plaintiff admitted that she was a "[c]urrent every day smoker." Id. Plaintiff's current medications were listed as Ambien, a sedative that treats insomnia, Diazepam, a sedative that treats anxiety, Lidoderm, a numbing medication, Metoprolol, a beta blocker, Promethean, a cough medication, Sertraline, an SSRI for depression and Tramadol, a narcotic pain medication. Id. Plaintiff was diagnosed with "unspecified essential hypertension" and "myalgia and myositis unspecified" and her prescriptions were renewed. Id.

On October 10, 2011, Plaintiff visited Pain Therapy Associates with complaints of "bilat[eral] leg pain." Id. at 572-74. Plaintiff reported a history of Hepatitis C, hypertension and depression. Id. at 572. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 573. Plaintiff's current medications were listed as Metoprolol, a beta blocker, Lidoderm, a numbing medication, Flector, an anti-inflammatory, Promethazine, an antihistamine, Ambien, an anti-insomnia, Sertraline, an SSRI for depression for depression, Gabapentin, a nerve pain medication and Norco, a narcotic pain medication. Id.

Plaintiff was noted to have "bilat[eral] leg pain.. reports leg numbness, tingling and burning... no back pain reported... pain worse with ambulation... has [history of] bulging disc in 2009.. reports that pain seems to be getting worse.. taking tramadol for pain, however reports accompanying [gastrointestinal] issues with use..." Id. During a review of symptoms, Plaintiff "report[ed] muscle weakness but report[ed] no muscle aches, no arthralgias/joint pain, and no back pain. She report[ed] numbness but report[ed] no loss of consciousness, no weakness, no seizures, no dizziness, and no headaches. She report[ed] sleep disturbances and restless sleep but report[ed] no depression, no mania, feeling safe in relationship, and no alcohol abuse. She report[ed] fatigue." Id. Upon

examination, Plaintiff was "ambulating normally" and had a "normal gait and station." Id. at 574.

Plaintiff's treatment plan noted "bilat[eral] leg pain with intermittent parasthesias... [history of] bulging disc in 2009... diagnosed with fibro[myalgia] at the time as well.. in need of updated mri [of] [lumbosacral] spine with [electromyogram]... [discontinue] tramadol... initiate norco.. [discontinue] valium... add gaba[pentin] [at bedtime].. tried and failed cymbalta and savella due to ineffectiveness... will consider injections on next visit... will get copy of medical records as she recently moved here from Tenn[essee].. labs today.. [followup in] 2 [weeks]." Id.

On October 18, 2011, Plaintiff underwent an MRI of her lumbar spine at Advocate Good Shepherd Hospital. Id. at 642-43. The MRI showed "[d]egenerative disc disease and facet arthropathy at L3-L4 and L4-L5 causing mild bilateral lateral recess flattening and mild bilateral foraminal narrowing at these levels as detailed above[.] There is also facet arthropathy at other levels." Id. at 643.

On October 24, 2011, Plaintiff underwent an x-ray of her right knee. Id. at 888-90. The x-ray showed "[p]robable slight narrowing joint space medially" and was otherwise "unremarkable." Id.

On October 24, 2011, Plaintiff also visited Pain Therapy Associates "for [followup] on back//leg pain." Id. at 569-72. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 570. Plaintiff's current medications were listed as Metoprolol, a beta blocker, Lidoderm, a numbing medication, Flector, an anti-inflammatory, Promethazine, an antihistamine, Ambien, an anti-insomnia, Sertraline, an SSRI for depression, Gabapentin, a nerve pain medication and Norco, a narcotic pain medication. Id. at 570.

Plaintiff was noted to be "here for [followup] on leg/back pain... bilat[eral] leg pain and

numbness with associated leg weakness... mild back pain reported... [gastrointestinal] upset reported with norco use.. no ad[v]erse events reported with gaba[pentin]." Id. During a review of symptoms, Plaintiff "report[ed] muscle weakness but report[ed] no muscle aches, no arthralgias/joint pain, and no back pain. ... She report[ed] no depression, no mania, no sleep disturbances, feeling safe in relationship, and no alcohol abuse. She report[ed] no fatigue." Id. Upon examination, Plaintiff was "ambulating normally" although it was noted that her "[right] paravert facet d/c with pain on palpation and limited [range of motion] on lateral rotation of [lumbosacral] spine.. [sacroiliac] joint and hip bursae inflammation also noted." Id. at 571. Plaintiff's treatment plan noted "back pain//leg weakness... mri revealed facet arthropathy with mild stenosis.. injections today to reduce inflammation... [discontinued] norco [a narcotic pain medication] due to [gastrointestinal] upset, switch back to t[r]amadol.. continue gaba[pentin] taper [at bedtime].. [physical] therapy with [A]chieve [Manual Physical Therapy].. [cyclic citrullinated peptide test] as lab revealed [positive for rheumatoid factor]... however no joint issues." Id.

Plaintiff received an "arthrocentesis/ injection of the right supratrochanteric bursae" that was "being done due to failure of conservative measures including anti-inflammatories, analgesics and appropriate physical therapy[.]" Id. The injection "was completed without complication" and Plaintiff "tolerated the procedure well." Id. Plaintiff also received "sacroiliac joint injections" due to "sacroiliac inflammation on exam, not responsive to conservative interventions." Id. Plaintiff also received "paravertebral facet joint nerve injections" for "pain [that] is rather significant and has not responded to conservative measures including exercise, physical therapy, and/or chiropractic recommended and/or anti-inflammatories used." Id. at 571-72.

On October 25, 2011, Plaintiff underwent a electrodiagnostic examination at Advocate Good

30

Shepherd Hospital. Id. at 645-46. The examination showed "[m]ild bilateral median neuropathies at the wrist, type II, and carpal tunnel syndrome[,]" "[m]ild length-dependent sensorimotor neuropathy[,]" "[m]ild chronic right L5 radiculopathy[,]" "[m]ild chronic left C7 (less likely C6) radiculopathy" and "[m]ild left ulnar neuropathies at the level of the ulnar groove." Id. at 645.

On November 10, 2011, Plaintiff visited Achieve Manual Physical Therapy for an initial visit. Id. at 540-43. Plaintiff was diagnosed with "Lumbago (Back Pain)" and "Muscle weakness." Id. at 540. Plaintiff "report[ed] injuring her low back and bilateral [lower extremities] [in] 2007, associated with taking medications for her hepatitis C. Patient reports that her pain started the next day after starting pegaferon and hapafarin. Her pain is currently worse than it was when it started." Id. According to Plaintiff, she was then "subsequently diagnosed with [lower back pain] and leg weakness" that was treated with physical therapy, but the physical therapy "made the condition worse." Id.

Plaintiff described current "low back pain radiating into the bilateral buttocks and [lower extremities]" that was "intermittent, severe deep sharp and occasional numb sensation." Id. Plaintiff stated that this pain was worsened by exercise, lying on her side, standing, walking, sitting, driving, lying down, cooking, doing dishes, gardening and climbing stairs and "eased by medications only." Id. Plaintiff admitted she was a "social" smoker. Id. Plaintiff discussed her previous MRI and said she was "unsure of results / thinks a ruptured disc." Id. Plaintiff's history included "Arthritis, Depression, Dizzy Spells, Hepatitis, High Blood Pressure" and her previous medical history included "[Osteoarthritis], depression, dizzy spells, hepatitis C, [hypertension]." Id. Plaintiff's current medications were listed as Gabapentin, a nerve pain medication, Tramadol, a narcotic pain medication, Hydrocodone, an opiod pain medication, Metoprolol, a beta blocker, Zoloft, an SSRI

for depression and "fibromyalgia," apparently referencing a fibromyalgia medication.  Id.

Upon examination, it was determined that Plaintiff experienced "low back radiating pain associated with lumbar disc displacement."  Id. at 542.  Physical therapy was suggested, and Plaintiff's "rehabilitation potential to achieve functional goals [wa]s fair."  Id.  Plaintiff's treatment plan was physical therapy twice a week, to taper over time to once a week, for a total of twelve weeks.  Id. at 543.

On November 12, 2011, Dr. Dennis Malecki conducted a internal medicine consultative evaluation for the Bureau of Disability Determination Services.  Id. at 322-26.  Dr. Malecki "reviewed all the information sent by the Bureau of Disability Determination Services" and conducted an evaluation in order to render an opinion.  Id. at 322.  Plaintiff was "felt to be a reliable historian" and reported that "[s]he last worked in May 2005 as a machine operator, a job she performed for twenty years.  She stopped working because she was terminated."  Id.  Plaintiff alleged disability due to "Problems with Legs" that she stated caused "constant burning, numbness and tingling involving both legs.  She states this began approximately four years ago and she relates it to treatment for hepatitis."  Id.  Plaintiff reported that her pain was at a constant nine out of ten and that activity "such as standing" worsened her pain.  Id.

Plaintiff stated that she engaged in these activities of daily living:

She is able to bathe herself.  She states she dresses herself but at times needs assistance.  She states she is unable to cook, unable to go grocery shopping.  She can be a passenger in a car.  She states she can do paper work and pay bills.  She can sit for five minutes, stand for five minutes, walk unassisted on a level surface for 100 feet and can carry approximately five pounds.  She states she is unable to do most household chores.  She can start the laundry or start washing dishes but if standing for any length of time is involved she is unable to perform the activities.

Id.

Plaintiff reported her current medications as Tramadol, a narcotic pain medication, Hydrocodone, an opiod pain medication, Sertraline, an SSRI for depression, Promethazine, an anti-histamine, Gabapentin, a nerve pain medication and Metoprolol, a blood pressure medication. Id. at 323. Plaintiff admitted to smoking "one-half pack of cigarettes a day for twenty years." Id. Upon examination, Plaintiff was "in no acute distress." Id. Plaintiff displayed a "fair" effort in testing, a score midway between "excellent" and "lack of maximum effort," and had full range of motion in her cervical spine and thoracic spine. Id. at 324, 326. Plaintiff's lumbrosacral spine showed "[n]o muscle spasm or tenderness. No deformity. Straight leg raises were negative bilaterally. No back pain or discomfort but she complained of tensing in her legs bilaterally at the level of the knees and below." Id. at 324. Plaintiff did not use an assistive devise "and none appears to be currently needed." Id. Plaintiff had "no difficulty with getting off and on the exam table. She stated that she was unable to heel-walk, toe-walk or tandem gait. She stated that she could only do this if she was holding onto something to support her. She could independently squat and arise with moderate difficulty to a degree of knee flexion of 40 [degrees]. Sitting and standing were normal. She was unable to independently single leg balance and weight bear." Id. Plaintiff also "complain[ed] of some discomfort in her right wrist." Id. at 325. Dr. Malecki summarized his clinical impression:

> 1) Peripheral neuropathy, carotid and abdominal bruits. (The finding of the bruits was given to the claimant, she denied any previous history. She was advised that this should be further evaluated. She states that she has [a]/ physicians appointment within the next several days and she will bring this up to the physician. Also currently no clinical symptomatology.)
>
> 2) Hypertension.
>
> 3) History of hepatitis-C.

Id.

On November 14, 2011, Plaintiff visited Achieve Manual Physical Therapy for a second visit. Id. at 544-47. Plaintiff reported that she felt "about the same / no worse" than her last treatment session, and that her pain was "about the same" and was an eight out of ten. Id. at 544. The provider noted, "[u]nsure how much change can be attained in physical therapy due to onset of pain. ... No apparent change again today in pain intensity." Id. at 546.

On November 15, 2011, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "to establish care and for adult physical with pap." Id. at 348-62. Plaintiff reported as her history: "Hepatitis C, tubal pregnancy and tubal ligation, hysterectomy, depression, chronic leg pain, hypertension, chronic nausea." Id. at 348. Plaintiff denied "chest pain or shortness of breath or headaches no dizziness or focal weakness," and admitted to a history of smoking. Id. Upon examination, Plaintiff had a "carotid bruit," an abnormal sound, on the right side of her neck but was otherwise normal. Id. at 349. Plaintiff was diagnosed with "[c]hronic leg pain/neuropathic in nature most likely due to herniated lumbar discs (chronic)," "[d]epression" that was "stable," "[n]europathic pain of lower extremity, most likely due to he[rni]ated lumbar discs (chronic)," "Hepatitis C, chronic," "[c]arotid artery bruit significant bruit," "[s]ystolic murmur," and "[p]osterior subcapsular cataract, bilateral." Id. at 349-50. Plaintiff underwent a vascular carotid duplex bilateral at Advocate Good Shepherd Hospital that showed "[n]o evidence for plaque formation or carotid stenosis ... Abnormal waveforms in the right vertebral artery suggesting presteal phenomena. Suggest CTA." Id. at 648.

On November 17, 2011, Plaintiff's test results were reviewed. Id. at 363-65. Plaintiff's HDL cholesterol was "nearly at goal, LDL low but with the presence of carotid bruit which signifies peripheral vascular disease would like to have patient start a low dose statin[.]" Id. at 363. It was

34

also suggested that Plaintiff supplement her folate and Vitamin D levels. Id. Plaintiff's prescription for Simvastatin was cancelled and Dr. Farrag informed Plaintiff of this change. Id. at 343. Dr. Farrag also discussed with Plaintiff the results of an artery test and they "agreed to a plan." Id. at 345. Regarding the carotid bruit, the imaging showed "[n]o evidence for plaque formation or carotid stenosis[.] Abnormal waveforms in the right vertebral artery suggesting presteal phenomena." Id. at 386. It was noted that Plaintiff would need a Magnetic Resonance Angiography (MRA). Id.

On November 21, 2011, Plaintiff visited Mercy Barrington Medical Center for the scheduled MRA. Id. at 339. Plaintiff was informed that the MRA was cancelled and that Plaintiff would instead undergo a Computed Tomography Angiography (CTA) of her neck and chest. Id. On November 22, 2011, Plaintiff underwent the CTA scan. Id. at 650-51. The scan showed "[d]ominant left vertebral artery with hypoplastic right vertebral artery. Carotid bifurcations are unremarkable" and "[m]ild prominence of the adenoids and lingual tonsils." Id. Plaintiff also underwent a mammogram that was inconclusive because the testing physician "need[ed] prior studies for comparison." Id. at 651-52. On December 1, 2011, this comparison was completed and the testing physician concurred with the previous mammogram that "[t]he 1.5 cm density in the left breast is probably benign." Id. at 654-55.

On November 28, 2011, Plaintiff also visited Pain Therapy Associates for her first Euflexxa injection. Id. at 567-69. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 567. Plaintiff's current medications were listed as vitamin D2, folic acid, Metronidazole, an antibiotic, Fluconazole, an antifungal, Gabapentin, a nerve pain medication, Metoprolol, a beta blocker, Lidoderm, a numbing medication, Flector, an anti-inflammatory, Promethazine, an antihistamine and Sertraline, an SSRI for depression. Id. at 568. Plaintiff's treatment plan noted "back pain//leg

weakness... mri revealed facet arthropathy with mild stenosis.. injections today to reduce inflammation... [discontinued] norco [a narcotic pain medication] due to [gastrointestinal] upset, switch back to tramadol.. continue gaba[pentin] taper [at bedtime].. [physical] therapy with [A]chieve [Manual Physical Therapy].. [cyclic citrullinated peptide test] as lab revealed [positive for rheumatoid factor]... however no joint issues." Id. Upon examination, Plaintiff was "ambulating normally" although her "[right] knee [degenerative joint disease]" was noted. Id. Plaintiff received an "Euflexxa injection" that was "considered for the treatment of pain in osteoarthritis of the knee because [Plaintiff] failed to respond adequately to conservative nonpharmacologic therapy and simple analgesics." Id. at 569. The "injection was completed without complication" and Plaintiff "tolerated the procedure well." Id.

On November 28, 2011, Plaintiff visited Achieve Manual Physical Therapy for a third visit. Id. at 548-51. On this visit, Plaintiff "received 2nd (of 3) injection to right knee. Last next Wednesday. Pain currently 8/10 (after last session 9/10, but not until later into the evening). Overall patient reports feeling about the same. Suggests that she has done a little exercising." Id. at 548. After physical therapy, Plaintiff showed no change, and the provider "[s]tressed that pain relief will be extremely gradual versus immediate. [Plaintiff] needs to be looking for small improvements." Id. at 550.

On November 28, 2011, Plaintiff also visited Pain Therapy Associates for a second Euflexxa injection "due to [degenerative joint disease] and cartilage loss." Id. at 564-66. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 565. Plaintiff's current medications were listed as Clonazepam, a sedative for anxiety, vitamin D2, folic acid, Metronidazole, an antibiotic, Fluconazole, an antifungal, Gabapentin, a nerve pain medication, Metoprolol, a beta blocker,

36

Lidoderm, a numbing medication, Flector, an anti-inflammatory, Promethazine, an antihistamine and Sertraline, an SSRI for depression. Id. Plaintiff's treatment plan noted "[right] leg weakness as a result of active L5 radiculopathy ... [physical] therapy with [A]chieve [Manual Physical Therapy] recently started.. boost gaba[pentin] to 3 1/2 [at bedtime].. [discontinue] [morning] dose due to intermittent dizziness and fatigue.. norco [a narcotic pain medication] stopped due to [gastrointestinal] intolerance.. [Plaintiff] would like to resume tramadol.. advised of use with zoloft - [Plaintiff] demonstrated understanding, she is not to exceed 4 tramadol/day.. consider repeat facet injections.. epidural consideration in the future as well." Id. at 566. Upon examination, Plaintiff was "ambulating normally" although her "[right] knee [degenerative joint disease]" was noted. Id. Plaintiff received an "Euflexxa injection" that was "considered for the treatment of pain in osteoarthritis of the knee because [Plaintiff] failed to respond adequately to conservative nonpharmacologic therapy and simple analgesics." Id. The "injection was completed without complication" and Plaintiff "tolerated the procedure well." Id.

On November 29, 2011, Plaintiff visited Dr. Ahmed Farrag at Mercy Barrington Medical Center "to discuss imaging of carotids and for clarification of testing ordered previously." Id. at 336-37. Plaintiff reported that she was "feeling well" and denied "dizziness, chest pain, [shortness of breath]" and had "no visual symptoms." Id. at 336. Plaintiff was diagnosed with "[s]ubclavian steal syndrome" and Plaintiff was "counseled regarding pathogenesis, signs and symptoms and agreed with plan." Id. at 337. Plaintiff was prescribed Fluticasone, a decongestant, and Azithromycin, an antibiotic. Id.

On November 30, 2011, Plaintiff visited Dr. Russ Tonkovic at Midwest Heart Specialists with complaints of "abnormal carotid [ultrasound], cp, dizziness, [lower extremity] edema, [lower

extremity] numbness, [lower extremity] pain and [shortness of breath]." Id. at 582-83. Plaintiff

admitted she was "an active cigarette smoker." Id. at 582. Upon examination, Plaintiff had a "right-

sided bruit" and was sent for a "carotid duplex" was normal and a CT scan that "suggested

hypoplasia of the right vertebral artery;" Plaintiff also "has symptoms suggestive of claudication.

This was attributed to lumbar disc disease, and, [Plaintiff] to her knowledge, she has not had a

vascular examination of her lower extremities." Id. Plaintiff described her symptoms as "trouble

sleeping," "bilat[eral] leg numb[ness]/burning/sting[ing]/swelling[ing]/hurt[s] to stand on,"

"lightheaded, dizziness[.]" Id. Plaintiff was ordered to undergo "[a] right-sided ultrasound of the

neck vessels ... to reevaluate vertebral flow and assess the subclavian artery" and a "[d]uplex

examination of the iliac system and low extremity arterial system" and was "advised to stop

smoking." Id. at 583. Plaintiff's current medications were listed as Clonazepam, a sedative for

anxiety, Diazepam, an anti-anxiety, Metoprolol, a beta blocker, Lidoderm, a numbing medication,

Promethazine, an antihistamine, Sertraline, an SSRI for depression and Tramadol, a narcotic pain

medication. Id.

On December 1, 2011, Plaintiff underwent a mammogram at Mercy Barrington Medical

Center. Id. at 629-30. Although there was a "1.5 cm density in the left breast at 12 o'clock middle

depth," the density was "probably benign" and a follow up appointment was recommended. Id.

On December 7, 2011, Plaintiff visited Achieve Manual Physical Therapy for a fourth visit.

Id. at 552-55. Plaintiff was "[n]ot good today. Splitting [headache] (frontal). [Plaintiff] got synvisc

injection to right knee today / Increased pressure. Pain currently 8-9/10 (also worst). Saw cardiac

surgeon / poor [lower extremity] arterial flow. To have [lower extremity] doppler on 12/22/11." Id.

at 552. After physical therapy, no change was noted and the provider wrote, "[s]till unsure how

much change can be attained in physical therapy due to onset of pain." Id. at 554. Plaintiff was prescribed twelve sessions, but this is the last session recorded in the medical record.

On December 7, 2011, Plaintiff also visited Pain Therapy Associates for a third Euflexxa injection "due to [degenerative joint disease] and cartilage loss." Id. at 562-64. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 563. Plaintiff's current medications were listed as Fluticasone, a decongestant, Azithromycin, an anti-infection medication, Clonazepam, a sedative for anxiety, vitamin D2, folic acid, Gabapentin, a nerve pain medication, Metoprolol, a beta blocker, Lidoderm, a numbing medication, Flector, an anti-inflammatory, Promethazine, an antihistamine and Sertraline, an SSRI for depression. Id. Upon examination, Plaintiff was "ambulating normally" and showed "good judgement." Id. Plaintiff received an "Euflexxa injection" that was "considered for the treatment of pain in osteoarthritis of the knee because [Plaintiff] failed to respond adequately to conservative nonpharmacologic therapy and simple analgesics." Id. at 564. The "injection was completed without complication" and Plaintiff "tolerated the procedure well." Id.

On December 14, 2011, Kirk Boyenga, Ph.D. conducted an "Illinois request for medical advice" on reconsideration of Plaintiff's denial of benefits. Id. at 1138-40. Dr. Boyenga wrote that "[t]he initial denial is being revised: I have reviewed all of the evidence in file and the [psychological review technique/mental RFC] of 06/22/2011 is affirmed." Id. at 1139. Dr. Boyenga wrote, "[t]he [psychological review technique] is considered appropriate as written and is affirmed. The claimant reports worsening depression. Collateral source states claimant has pain and suffering everyday but still in good spirits. [Medical source evaluation] at 11/12/11 internist [consultative examiner] showed normal range of concentration, comprehension and reasoning. Recent and remote memory intact. Oriented X3." Id. at 1140.

On December 16, 2011, Dr. Richard Bilinsky performed a physical residual functional capacity assessment (RFC). Id. at 387-94. Plaintiff's primary diagnosis was "[d]egenerative joint and disc disease" and her secondary diagnosis was hypertension. Id. at 387. Dr. Bilinsky limited Plaintiff to occasionally lifting and carrying fifty pounds, frequently lifting and carrying twenty-five pounds, standing, walking and sitting for about six hours in an eight-hour workday, and unlimited pushing and pulling. Id. at 388. In support of these limitations, Dr. Bilinsky cited Plaintiff's medical records. Id. at 388-89. Dr. Bilinsy also limited Plaintiff to occasionally climbing ladders, ropes and scaffolds and to frequently stooping and crouching. Id. at 389. In support of this, Dr. Bilinksy wrote that "[d]egenerative changes in lumbar spine limits stooping and crouching. Decreased hand grasp limits climbing ladders/ropes/scaffolds. No other postural limitations are indicated." Id. Dr. Bilinsky found Plaintiff "partially credible," and wrote:

> Claimant alleges disability due to fibromyalgia, however at the [consultative examination] in March 2011, claimant has no reaction or point tenderness at sites associated with fibromyalgia. At [consultative examination] dated 11/12/11 claimant states she has disability due to problems with legs. There is no mention of fibromyalgia at this exam. Claimant states at 11/12/11 [consultative examination] that she can carry approx[imately] 5 pounds. There is no evidence to support this restriction. Claimant had full [range of motion] of lumbar spine at 3/11 exam but at 11/11 exam was only able to independently flex to 45 degrees. This may [] be a lack of effort when comparted to 3/11 exam with no intervening trauma.

Id. at 392.

Dr. Bilinsky reviewed Plaintiff's medical records, including a "[m]edical source statement by Dr Keown 3/30/11" that was "from an examining source with only a brief relationship with the claimant. This is given consideration but not great weight." Id. at 393. Dr. Bilinsky concluded, "[a]pparently no current symptoms from Hep[atitis] C. No significant weight loss due to stomach sensitivity and no complications from insomnia. No [congestive heart failure] or [end organ

40

damage] due to [hypertension]." Id. at 394.

On December 16, 2011, Nancy Kellam reviewed Plaintiff's RFC. Id. at 265-66. Kellam wrote, "[t]he current RFC, dated 12/16/11, limits [Plaintiff] to medium work activity. Although the additional postural restrictions indicated by this assessment of capacity would limit this range of work, the performance of the majority of jobs at this exertional level would be possible." Id. at 265. Kellam wrote that "all potentially applicable medical-vocational guidelines would direct a finding of 'not disabled,' given the claimant's age, education, and RFC." Id.

On December 19, 2011, Plaintiff visited Dr. Asad Raqif at Mercy Barrington Medical Center "for evaluation and management of a positive Hepatitis C antibody test. [Plaintiff] tested positive a few weeks ago. Test was performed as part of an evaluation of known exposure to hepatitis C." Id. at 599-60. Plaintiff complained of fatigue and dizziness. Id. at 599. It was noted that "[Plaintiff] was treated for 6 months with PEG-IFN [pegylated interferon] and the ribavarin and she responded adequately and was checked for a HepC viral load in July 2011, which was negative." Id. Plaintiff's past medical history was listed as chronic leg pain, depression, hypertension, chronic nausea, allergy, Hepatitis C and tubal pregnancy. Id. Plaintiff's current medications were listed as Fluticasone, a decongestant, vitamin D, folic acid, Gabapentin, a nerve pain medication, Tramadol, a narcotic nerve pain medication, Sertraline, an SSRI for depression, Metoprolol, a beta blocker and Promethazine, an antihistamine; Plaintiff also listed Azithromycin, an antibiotic, but this was discontinued. Id. at 600. Plaintiff admitted she was a "Current Everyday Smoker – 0.5 packs/day for 20 years[.]" Id. During a review of symptoms, Plaintiff was negative for "anxiety, depression or mood swings" and negative for "joint pain, joint stiffness, joint swelling, muscle pain or muscular weakness." Id. at 601. Dr. Rafiq planned to "get records from Tennessee regarding the treatment," "check an

41

[ultrasound] of the abdomen and an [alpha-fetoprotein test]" and to "[s]chedule a screening colonoscopy." Id. at 603.

On December 19, 2011, Plaintiff's request for reconsideration was considered, and it was determined that "the previous determination denying [Plaintiff's] claim was proper under the law." Id. at 134-37.

On December 23, 2011, Plaintiff visited Dr. Tonkovic at Midwest Heart Specialists to "[d]iscuss test results; Plaintiff had no "interim cardiac complaints." Id. at 584-85. Plaintiff had undergone a carotid ultrasound, an aortoiliac duplex and a lower extremity arterial duplex ultrasound on December 22, 2011. Id. at 592-94. Plaintiff's "carotid duplex did not suggest significant stenosis in the right subclavian artery or vertebral artery. She did have an early systolic deceleration pattern noted in the left vertebral, however, there is no evidence to suggest stenosis in the vertebral or subclavian vessel. Her abdominal aorta suggested high-grade intraabdominal stenosis, with possible occlusion of the iliac arteries bilaterally. Collateral flow demonstrated normal velocities down the leg, with no evidence to suggest stenosis in the lower extremities." Id. at 584. Upon examination, Plaintiff was "doing well." Id. Plaintiff was diagnosed with "intraabdominal aortic stenosis" that "likely is contributing to symptoms of claudication[.]" Id. at 585. Plaintiff was ordered to undergo a CR angiogram of the aorta and iliac vessels. Id. Plaintiff's current medications were listed as Gabapentin, a nerve pain medication, Clonazepam, a sedative for anxiety, Lidoderm, a numbing medication, Metoprolol, a beta blocker, Promethazine, an antihistamine, Sertraline, an SSRI for depression and Tramadol, a narcotic pain medication. Id.

On December 28, 2011, Plaintiff underwent a CT scan of her abdomen and pelvis at Mercy Barrington Medical Center. Id. at 631. The scan showed "[n]o abdominal aortic aneurysm.

42

However, occlusion of the abdominal aorta distal to the renal arteries with reconstitution at the bifurcation. Small caliber of common iliac arteries." Id.

On January 16, 2012, Plaintiff underwent a colonoscopy at Mercy Barrington Medical Center. Id. at 635. Dr. Rafiq collected three polyps to biopsy. Id. at 633-37.

On January 26, 2012, Plaintiff visited Dr. Tonkovic at Midwest Heart Specialists for "[f]ollowup of Bruit, [Right] carotid and Followup of Claudication." Id. at 586-87. Plaintiff had undergone a nuclear stress test on January 19, 2012. Id. at 595-97. Plaintiff's CT scan "demonstrate[d] occlusion of the mid[dle] portion of the aorta. Reconstitution is seen in the iliac vessels via collateral flow. The iliac vessels are heavily calcified and are of small caliber." Id. at 586. Upon examination, Plaintiff was "doing well." Id. Plaintiff was "symptomatic of claudication. She has occlusion of the aorta. I suspect that this may not be easily approached with a percutaneous procedure or stent procedure and [Plaintiff] may require an aortobifem[oral] bypass" and the provider referred Plaintiff to Dr. Votapka's office. Id. at 587. Plaintiff's current medications were listed as Gabapentin, a nerve pain medication, Clonazepam, a sedative for anxiety, Lidoderm, a numbing medication, Metoprolol, a beta blocker, Promethazine, an antihistamine, Sertraline, an SSRI for depression and Tramadol, a narcotic pain medication. Id.

On January 30, 2012, Plaintiff visited Dr. Rafiq at Mercy Barrington Medical Center "for a follow up and she feel[s] fine after a screening colonoscopy that was done 2 weeks ago at Good Shepherd Hospital." Id. at 603-07. Plaintiff's colonoscopy showed "three polyps in the colon, and the one polyp in the descending colon was hyperplastic and the other two sessile <10 mm polyps were tubular adenomas in the right side of the colon." Id. at 603. Dr. Rafiq noted that "[Plaintiff] feels fine today and denies any significant problems." Id. Plaintiff's current medications were listed

as Methylprednisolone, an anti-inflammatory, Azithromycin, an antibiotic that was discontinued, Polyethylene Glycol-Electrolytes, a pre-colonoscoy treatment, Flonase, an allergy medication, vitamin D, folic acid, Tramadol, a narcotic pain medication, Sertraline, an SSRI for depression, Metoprolol, a beta blocker, Promethazine, an antihistamine, and Gabapentin, a nerve pain medication that was discontinued. Id. at 604. Plaintiff admitted she was a "Current Everyday Smoker – 0.5 packs/day for 20 years." Id. at 605. During a review of symptoms, Plaintiff was "negative for – anxiety, depression or mood swings." Id. Plaintiff's treatment plan was to "[r]epeat colonoscopy in 5 yrs," "check an [ulatrasound] of the abdomen yearly" and begin a "[h]igh fiber diet." Id. at 607.

On January 31, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "coming in to discuss smoke cessation and upcoming intraabdominal aortic stenosis repair coming up soon. ... She notes worsening episodes of ischemic lower extremity pains related to activity and notes that the pain goes up to a 7/10." Id. at 607-08. Plaintiff "was seen today for advice only" although she was prescribed Chantix, a smoking cessation medication, and Valium, a sedative, for "[i]schemic lower extremity pains[.]" Id. at 608.

On February 13, 2012, Plaintiff visited Dr. Timothy Votapka at Advocate Good Shepherd Hospital for a consultation regarding aortoiliac occlusive disease. Id. at 678-79. Plaintiff reported that "[f]or the last 4 or 5 years [she] has had pain in her thigh and buttocks upon ambulation. This originally has been attributed to lumbar or sacral spine problems and to a lesser extent to fibrmyalgia." Id. at 678. Plaintiff's current medications were listed as Metoprolol, a beta blocker, Diazepam, a sedative for anxiety, Tramadol, a narcotic pain medication and Sertraline, an SSRI for depression. Id. at 679. Plaintiff admitted to smoking, but claimed she "smokes 5-6 cigarettes every day and is trying to cut down." Id. Dr. Votapka recommended aortobifemoral bypass grafting and

44

Plaintiff agreed to undergo this procedure. Id.

On February 17, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "here for pre[-]op physical for surgery 2/21/12 with Dr V[o]t[a]pka at [Good Shepherd Hospital] for aorto bi-femoral bypass. Had labs at [Good Shepherd Hospital] this morning and CXR. EKG done here today." Id. at 609-11. Plaintiff complained of "lower extremity pain." Id. at 609. Plaintiff's current medications were listed as Valium, a sedative, vitamin D, folic acid, Tramadol, a narcotic pain medication, Metoprolol, a beta blocker, Chantix, a smoking cessation medication, Flonase, an allergy medication that was discontinued, Sertraline, an SSRI for depression that was discontinued and Promethazine, an antihistamine that was discontinued. Id. at 609. Plaintiff admitted she was a "Current Everyday Smoker – 0.5 packs/day for 20 years[.]" Id. at 610. Upon examination, Plaintiff's gait was "normal." Id. Plaintiff's treatment plan was to "[p]roceed with surgery as planned," although it was also noted that Plaintiff had "[t]obacco dependence" and Plaintiff was "counseled in length and intends to quit starting tomorrow[.]" Id. at 611.

On February 17, 2012, Plaintiff submitted updated information to SSA. Id. at 269-75. Plaintiff stated that her "condition is worse no feeling in her legs aorta is totally blocked and needs to have b[y]pass surgery" and this change occurred in "Oct 2011." Id. at 269. Plaintiff also stated a new limitation due to her condition, that "[b]ecause of the lack of feeling in her legs, she often has to use a cane to walk around[.] Only leaves the house to go to the doctors visits[.] Husband and step son in home helps with younger children" and this change occurred in "Nov 2011." Id. Plaintiff stated that her ability to care for herself was affected because "[o]n a bad depression day will stay in bed most of the day. Will not eat or read which she normally likes to do. Won't answer the phone. Husband helps with fixing meals. She is unable to stand to cook." Id. at 273. Plaintiff

stated that her daily activities changed because she "[n]eeds to use cane to walk around because of numbness in her legs[.] Does not leave the house except to go to doctors. Step son helps with younger children. Husband helps with cooking and cleaning and taking care of children. When she sits down, she needs to elevate her legs[.] Has to take a nap in the morning and afternoon[.] Mostly just sits and reads all day (they do not have a TV in the house) currently unable to do anything but sit on couch and wait for surgery[.]" Id.

On February 24, 2012, Plaintiff underwent the aortobifemoral bypass and was admitted to Advocate Good Shepherd Hospital for several days. Id. at 682-762. Plaintiff was discharged on March 2, 2012 "in stable condition." Id. at 750.

On March 7, 2012, Plaintiff visited Cardiothoracic and Vascular Surgical Associates "for postoperative follow-up of aorto-bifemoral bypass graft, which was performed on 02/24/2012." Id. at 557-58. Plaintiff "complained of symptoms consistent with incisional pain and constipation which began since surgery. She notes the pain has improved somewhat, but not resolved. ... She also noted low grade fever of 99F maximum." Id. at 557. Upon examination, Plaintiff had a "[n]ormal gait" and was "able to stand without difficulty." Id.

On March 12, 2012, Plaintiff visited Pain Therapy Associates with complaints of "Fibromyalgia.. Spinal stenosis... Hypertension.." Id. at 560-61. Plaintiff also reported as her history osteoarthosis in her lower leg, lumbosacral spondylosis without myelopathy, Hepatitis C and depression. Id. at 560. Plaintiff admitted she was a "[c]urrent every day smoker." Id. Plaintiff's current medications were listed as Diazepam, a sedative for anxiety, vitamin D2, PEG-3350, for constipation, Methylprednisolone, an anti-inflammatory, Tramadol, a narcotic pain medication, Fluticasone, a decongestant, Clonazepam, a sedative for anxiety, folic acid, Gabapentin, a nerve pain

medication, Metoprolol, a beta blocker, Lidoderm, a numbing medication, Flector, an anti-inflammatory, Promethazine, an antihistamine and Sertraline, an SSRI for depression. Id. at 561.

On March 27, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for new evaluation and treatment of [] depression." Id. at 612-15. Plaintiff "complain[ed] of depressed mood, insomnia and feelings of worthlessness/guilt. Onset was approximately a few year(s) ago, graudally worsening over the past month. ... [Plaintiff] stopped zoloft back in January electively. She was on 100mg [by mouth] [three times a day] for 9 years continuo[u]s." Id. at 612. Plaintiff's current medications were listed as Diazepam, a sedative for anxiety, Metoprolol, a beta blocker, Chantix, a smoking cessation medication, vitamin D, folic acid, and Tramadol, a narcotic pain medication that was discontinued. Id. at 613. Plaintiff admitted she was a "Current Everyday Smoker – 0.5 packs/day for 20 years[.]" Id. Dr. Farrag noted that Plaintiff had "depression – worsening[.]" Id. at 614. Plaintiff's treatment plan was to begin an SSRI, Zoloft, and to undergo bloodwork for a comprehensive metabolic panel, a complete blood count and a thyroid-stimulating hormone test. Id. at 615.

On April 9, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for follow [up] evaluation and treatment of [] depression" that was "gradually improving over the past 2 weeks." Id. at 615-18. Dr. Farrag noted Plaintiff's risk factor as "negative life event surgery a month ago and previous episode of depression[.]" Id. Plaintiff's current medications were listed as Diazepam, a sedative for anxiety, Metoprolol, a beta blocker, Chantix, a smoking cessation medication, vitamin D, folic acid, and Tramadol, a narcotic pain medication that was discontinued. Id. at 616. Plaintiff admitted she was a "Current Everyday Smoker – 0.5 packs/day for 20 years[.]" Id. at 617. It was noted that Plaintiff "was seen today for recheck, medication management and leg

47

pain." Id. at 618. Plaintiff's treatment plan was that her "[d]epression [was] doing better" and to "[c]ontinue zoloft;" additionally, "[Plaintiff] [was] counseled." Id.

On April 14, 2012, Plaintiff underwent a left heart catheterization, coronary angiogram and abdominal aortic angiogram at Advocate Good Shepherd Hospital. Id. at 763-857. Plaintiff was admitted to the hospital for several days and was discharged on April 18, 2012. Id. at 819. On April 14, 2012, Dr. Mahreen Majid consulted Plaintiff upon admission. Id. at 853-55. Plaintiff "states that she was doing well postoperatively for a short time and most recently she has noted bilateral lower extremity swelling, intermittent numbness and tingling of her lower extremities, burning and throbbing discomfort in her lower extremities. She states she has noted discoloration in her toenails. She also states for the last 5 days she has had intermittent substernal chest pain with occasional sweats and palpitations. She complains of right arm numbness and tingling." Id. at 853. Plaintiff admitted a "30-year smoking history" and claimed she "used to smoke one pack per day, but over the last 4 months has cut down to five cigarettes per day." Id. at 854. Dr. Majid decided to consult the Vascular Surgery Department, order a two-dimensional echocardiogram and place Plaintiff on telemetry. Id. at 855.

During the consultation on April 15, 2012, Plaintiff reported that after her February aortobifemoral bypass surgery, "she did very well for the first two weeks and then she started having numbness and burning sensation, and muscle spasm in the lower extremities, and could not walk much, but was still able to walk. Then [Plaintiff] developed swelling of the lower extremities this week." Id. at 847-49. Plaintiff also reported "recurrent retrosternal chest pain lasting for 1-2 minutes almost any time and was not exertional, and was not associated with any symptoms. After the appearance of chest pain she would also feel some numbness in the right forearm." Id. at 847. It was

noted that Plaintiff "smokes cigarettes for years and still smokes in spite of recent diagnosis of peripheral arterial disease. She is aware that she has to stop smoking completely and states that she smokes only three cigarettes per day." Id. at 848. Upon examination, it was noted that Plaintiff had a "loud bruit in the right carotid and soft bruit on the left carotid. Also there is bruit over the left and right subclavian arteries/over the clavicle." Id. Plaintiff's treatment plan was to "do cardiac catheterization and coronary angiogram." Id. at 849. These procedures showed "normal coronary arteries with minimal arteriosclerotic plaque in midportion of the right coronary artery and [Plaintiff] has obstructive lesion in the abdominal aorta above the abdominal aortic graft." Id. at 820.

On April 16, 2012, Plaintiff was evaluated again by Dr. Votapka. Id. at 850-51. Dr. Votapka noted that Plaintiff "was found to have a totally occluded distal abdominal aorta with a small aortic aneurysm and total occlusion of her iliac arteries. In February of this year she underwent aortobifemoral bypass grafting." Id. at 850. Plaintiff reported that "she felt very well and had no significant paresthesias in her leg. Over the past several weeks, she has developed some numbness and tingling of her lower extremities. Her feet have been warm. She does not have any claudication-type symptoms. She also had some minor swelling of her legs." Id. Dr. Votapka recommended "a CTA of [Plaintiff's] abdomen and pelvis with distal runoff to evaluate her peripheral vasculature." Id. at 850-51.

Upon discharge, Plaintiff was diagnosed with "[s]evere peripheral vascular disease[,]" "[a]typical chest pain" and "[p]eripheral neuropathy" and was noted to be an "[a]ctive tobacco" user and to have "[c]hronic obstructive pulmonary disease." Id. at 852. Plaintiff was prescribed Lyrica and "smoking cessation was addressed multiple times." Id.

Following Plaintiff's surgery, she submitted a "claimant's recent medical treatment" form

to SSA. Id. at 289. Plaintiff wrote, "I needed Arota (sic) Bypass and my Legs are Damaged. Dr. Votopka did the surgery. Russ Tonkovia said my Legs would never be the same. He felt there is another problem somewhere else." Id.

On April 27, 2012, Plaintiff underwent a CTA of her abdomen, pelvis and bilateral lower extremity. Id. at 859-60. The test showed "[f]ocal circumferential soft tissue thickening of the mild abdominal aorta, just inferior to the renal arteries, just proximal to the aortic anastomosis of the bypass graft. This may represent thrombus. This causes approximately 50% focal stenosis[,]" "[p]atent aortobifemoral bypass graft[,]" "[t]wo vessel runoff to the left foot/ankle due to occlusion of the distal left anterior tibial artery. However, reconstitution of the dorsalis pedis via the peroneal[,]" "[s]table roncalcific plaque causing focal moderate stenosis at the origin of the superior mesenteric artery. Chronically occluded inferior mesenteric artery" and "[u]ncomplicated sigmoid diverticulosis." Id. at 860.

On April 30, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for follow [up] evaluation and treatment of [] depression." Id. at 618-21. Plaintiff "complain[ed] of depressed mood, insomnia and feelings of worthlessness/guilt. Onset was approximately a few year(s) ago, gradually improving over the past 4 weeks." Id. at 618. Dr. Farrag noted that "[p]revious treatment includes Zoloft and individual therapy." Id. at 619. Plaintiff's current medications were listed as Diazepam, a sedative for anxiety, Metoprolol, a beta blocker, Chantix, a smoking cessation medication, vitamin D, folic acid, and Tramadol, a narcotic pain medication that was discontinued. Id. Plaintiff admitted she was a "Current Everyday Smoker – 0.5 packs/day for 20 years[.]" Id. at 620. Plaintiff's treatment plan was that her "[d]epression [was] doing better" and to "[c]ontinue zoloft;" additionally, "[Plaintiff] [was] counseled;" Plaintiff was also prescribed

Lipitor, a statin for high cholesterol. Id. at 621.

On May 9, 2012, Plaintiff visited Dr. Votapka at Advocate Good Shepherd Hospital for the results of her CTA. Id. at 862-63. Dr. Votapka wrote, "[t]he CTA reveals some residual clot or atheromatous debris in the abdominal aorta just distal to the renal arteries, but proximal to the graft. The causes a proximally 50% focal stenosis. The aortobifemoral bypass graft itself looks fine. She has two-vessel runoff to the left foot and ankle on the left side and the right side has three-vessel runoff. Her superficial femoral arteries are both patent. I told her that I was [] happy with the results of the CTA." Id. at 862. Dr. Votapka ordered a venous duplex study of the bilateral lower extremities. Id. On May 11, 2012, Plaintiff underwent the venous ultrasound and it showed "[n]o evidence of lower extremity deep venous thrombosis." Id. at 865.

On May 24, 2012, Plaintiff visited Dr. Tonkovic at Midwest Heart Specialists for "[f]ollowup of Bruit, [Right] carotid and Followup of Claudication." Id. at 588-89. It was noted that "[s]ince [the aortoiliac bypass graft], [Plaintiff] has had a lot of problems with swelling in both lower extremities. Her feet are markedly swollen." Id. at 588. Plaintiff received the results of a CT scan that "demonstrated a soft tissue swelling near the renal arteries which was felt to be residual hematoma and this was causing a compression of the aorta above the graft of approximately of 50% severity. [Plaintiff] did have a coronary angiogram performed it was completely normal." Id. Upon examination, Plaintiff had a "[lower extremity] edema." Id. Plaintiff was diagnosed with "peripheral arterial disease with aortobifemoral bypass graft" and it was noted that because of this "[Plaintiff] has stopped smoking." Id. at 589. Plaintiff's current medications were listed as aspirin, Atorvastatin Calcium, a statin, folic acid, Plavix, a blood thinner, Valium, an anti-anxiety, vitamin D, Gabapentin, a nerve pain medication, Clonazepam, a sedative for anxiety, Lidoderm, a numbing

51

medication, Metoprolol, a beta blocker, Promethazine, an antihistamine and Sertraline, an SSRI for depression. Id.

On May 24, 2012, Plaintiff also visited Dr. Farrag at Mercy Barrington Medical Center "coming in [complaining of] bilateral lower extremity swelling for the past 3 weeks ... Notes her mood is stable." Id. at 621-22. Dr. Farrag noted that Plaintiff "was seen today for recheck and edema." Id. at 622. Dr. Farrag determined that Plaintiff had a "[b]ilateral lower extremity edema, most likely due to side effects of Gabapentin, [discontinue] gabapentin[.]" Id. Dr. Farrag noted that Plaintiff's "[d]epression [was] doing well[.]" Id.

On May 26, 2012, Plaintiff underwent a CTA of the abdomen and pelvis at Advocate Good Shepherd Hospital. Id. at 867-68. The test showed "noncalcified short segment focus of circumferential soft tissue thickening narrowing the abdominal aorta just below the takeout of the bilateral renal arteries extending at the superior level of the surgical clips resulting in 50% lumina narrowing." Id.

On May 30, 2012, Plaintiff visited Dr. Votapka at Advocate Good Shepherd Hospital. Id. at 883-84. Upon examination, Dr. Votapka noted that "[Plaintiff] does have significant 3 to 4+ edema from the dorsum of the foot, certainly to the level of the knee. There is mild cellulitis and it is painful. The foot is, however, warm." Id. at 884. Dr. Votapka consulted with Dr. Tonkovic and concluded "a venogram would be in order." Id. Plaintiff's husband was present and was "concerned that [Plaintiff] is still not on Lyrica. She was on Lyrica before surgery and felt that that helped to some degree control her pain." Id. This was an insurance issue, and Dr. Votapka offered to speak to the relevant insurance contact. Id.

On June 6, 2012, Plaintiff underwent a bilateral lower extremity/pelvic venogram, a superior

52

and inferior vena cavogram, a left common iliac venous angioplasty and an inferior vena caval angioplasty. Id. at 879-81. The tests showed "[m]ild extrinsic compression of the infrarenal IVC successfully angioplastied with 22 mm balloon[,]" "[c]ommon and external iliac veins appear within normal limits" and "[s]uprarenal and intrahepatic IVC appear within normal limits." Id. at 881.

On June 11, 2012, Plaintiff visited Dr. Tonkovic at Midwest Heart Specialist for "[f]ollowup of Edema." Id. at 590-91. Plaintiff received the results of a CT venogram that was "negative for thrombosis." Id. at 590. Plaintiff also stated that "she had an invasive contrast venogram several days ago. This was negative for significant stenosis in the pelvis or abdomen." Id. Upon examination, Plaintiff had a "[lower extremity] edema." Id. Although at her last visit it was noted that Plaintiff "has stopped smoking," on this visit the note states that Plaintiff "smokes, advised to quit." Id. Plaintiff had a "marked lower extremity edema. This is a new finding since her operation. Given that we have ruled out venous thrombosis and compression in venous structures as an etiology, I suspect we are not with lymphedema as a diagnosis of exclusion." Id. at 591. Plaintiff's current medications were listed as aspirin, Atorvastatin Calcium, a statin, folic acid, Plavix, a blood thinner, Valium, an anti-anxiety, vitamin D, Gabapentin, a nerve pain medication, Clonazepam, a sedative for anxiety, Lidoderm, a numbing medication, Metoprolol, a beta blocker, Promethazine, an antihistamine and Sertraline, an SSRI for depression. Id.

On July 3, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for follow [up] on depression." Id. at 624-26. Plaintiff "note[d] her mood is stable and her sleep is better" and "indicate[d] that she is feeling well[.]" Id. at 624-25. Plaintiff also "note[d] her feet are swollen and have been since a few days after her aortic surgery[.]" Id. at 625. Plaintiff's treatment plan noted that her "Depression [was] Stable" and that Dr. Farrag would "continue zoloft[.]" Id. Dr. Farrag

53

also "prescribe[d] pressure stockings[,]" "counseled [Plaintiff] to quit smoking[,]" suggested "Aspirin and plavix" and encouraged exercise. Id. at 626.

On July 10, 2012, Pamela Tinsley completed a case analysis and wrote only "[l]ess than a fully favorable determination." Id. at 395.

On October 8, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "with right shoulder pain." Id. at 892-93. Plaintiff stated that "[t]he symptoms began 6 months ago[.] Course of symptoms since onset has been symptoms have progressed to a point and plateaued.. Pain is described as overall severity = moderate, location: glenohumeral region and worse with overhead movements. Symptoms were incited by sleeping the wrong way in April." Id. at 892. Plaintiff also complained of "chronic neuropathic lower extremity pains that have [persisted] even after her vascular surgery, [Plaintiff] notes pains are controlled on valium and lyrica[.]" Id. Plaintiff noted that her "mood [wa]s good, her sleep [wa]s good" and that her "bilateral lower extremity swelling that has been followed up extensively with vascular causes ruled out ... it is much better." Id. Upon examination, Plaintiff's left shoulder "appears normal, full [range of motion]," but her right shoulder displayed "[n]on-specific diffuse tenderness about the shoulder, [p]ositive impingement sign, decrease passive and active [range of motion], unable to raise right arm above shoulder level, weakness in extension and flexion due to pain[.]" Id. Plaintiff's treatment plan was to consult physical therapy, get an x-ray and increase the dose of Lyrica, a nerve pain medication. Id. at 893.

On October 11, 2012, Plaintiff visited Advocate Good Shepherd Hospital for an x-ray of her right shoulder. Id. at 904-05. The x-ray showed "[n]o evidence of fracture or dislocation of the glenohumeral joint space. Degenerative changes in the distal acromioclavicular joint. Calcified mediastinal lymph nodes." Id. at 904.

On October 31, 2012, Plaintiff visited Advocate Good Shepherd Hospital for a mammogram that showed that "[b]enign appearing calcifications are present in the right breast and benign appearing calcifications and a benign appearing lymph node are present in the left breast." Id. at 906.

On November 19, 2012, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center and "indicate[d] that she is feeling well and denies any symptoms referable to her hypertension. She is exercising and is adherent to low salt diet. Blood pressure is well controlled at home." Id. at 893-94. Plaintiff "notes her shoulder [pain is] 7-8, middle portion worse with motion above shoulder level, better with rest. [Plaintiff] has tried physical therapy without improvement." Id. at 893. Regarding depression, Plaintiff "notes her mood is good and stable, notes her sleep is better." Id. Upon examination, Plaintiff's "[r]ight should[er] [had] limited abduction with right arm raise above shoulder level and positive impingement sign[.]" Id. at 894. Plaintiff's diagnoses were listed as "[h]ypertension, stable, controlled" and "[b]ilateral lower extremity edema, chronic" with a prescription for Hydrochlorothiazide, a blood pressure medication for both conditions; "[r]otator cuff tear arthropathy of right shoulder," with instructions to "RICE" [rest, ice, compression, and elevation] and an order for an MRI; "[d]epression, stable in remission" with Sertraline, an SSRI for depression; and eczema, with a prescription for Clobetasol, a corticosteroid. Id.

On December 5, 2012, Plaintiff visited Advocate Good Shepherd Hospital for an MRI of her right shoulder. Id. at 911-12. The MRI showed "[p]artial-thickness undersurface tear of the anterior supraspinatus centered at the critical zone as above. Additional partial-thickness tear of the anterior distal infraspinatus near its insertion is probably confined within the substance of the tendon" and "[m]ild hypertrophic arthropathy of the acromioclavicular joint." Id.

On December 10, 2012, Plaintiff was admitted to Advocate Good Shepherd Hospital and

stayed for several days. Id. at 914-73. On December 10, 2012, in an initial consultation with Dr. Abas Amiry, Plaintiff reported that since her previous surgery, "she has some numbness of the lower extremities and feels that is swollen and she takes diuretics and also, she has very limited activity and because she feels that her legs may give up and she may fall and she does activity around the house." Id. at 964-66. Plaintiff also "state[d] that about 2 weeks ago [she] started having heart racing and it did appear that any time lasting for few minutes and she never had palpitations in the past, and also she has been complaining of some retrosternal chest discomfort. The retrosternal chest discomfort associated with shortness of breath, lasting for less than a minute, but shortness of breath lasts longer." Id. at 965. Plaintiff reported that "she quit smoking on April of 2012." Id. Dr. Amiry decided to "do an echocardiogram. Carotid Doppler study and Doppler study of the lower extremities, and lipid profile. We will discontinue simvastatin. Continue atorvastatin. Also, we will do a TSH. Further treatment depends on the findings and we will observe the patient for 1 more day and plan to observe the patient for dyspnea. Also, we will increase the metoprolol and I asked [Plaintiff] to take diuretics as needed when she has swelling of the lower extremities and at the present time, the patient does not have any edema of the lower extremities." Id. at 966. On December 10, 2012, Plaintiff underwent a chest x-ray that showed a "[n]ormal appearance of the cardiomediastinal silhouette. ... No focal lung opacity, pleural effusion or pneumothorax." Id. at 961.

On December 11, 2012, Plaintiff had another consultation with Dr. Shiva Gupta and "[o]n further questioning, she also admits to occasional dizziness, but she states that it gets better pretty quickly. Also complains of some hot flashes." Id. at 968-70. Plaintiff claimed that "[s]he has smoked a pack per day for 35 years, which she quit last year." Id. at 969. Dr. Gupta noted that the chest x-ray "showed no acute findings" and that the carotid doppler and lower extremity arterial

56

doppler tests were "pending." Id. Dr. Gupta's treatment plan was to "check a TSH with reflex and look for other causes" for Plaintiff's chest pain, shortness of breath and palpitations; continue with the doppler tests for Plaintiff's peripheral vascular disease; a note that Plaintiff's hypertension was "currently well controlled;" and a sequential compression device for Plaintiff's deep venous thrombosis prophylaxis. Id. at 970.

On December 12, 2012, Plaintiff underwent a "bilateral carotid vascular duplex ultrasound" that showed "[n]o evidence of hemodynamically significant stenosis." Id. at 962-63. Plaintiff also underwent a "vasc[ular] ext[remity] [lower] [duplex] arterial bil[ateral]" that showed "Moderate-Severe Bilateral, distal aortobifemoral anastomotic stenoses ... Should be amendable to percutaneous treatment." Id. at 963-64.

On December 17, 2012, Plaintiff visited Northwest Cardiology Associate with "[l]ower extremity claudication[.]" Id. at 994-96. Plaintiff complained of "numbness, heaviness, and tingling which occur while walking and start walking as little as 15-20 feet. The symptoms are relieved by rest and sometimes if she dangles her legs over the side of the bed." Id. at 994. Plaintiff's current medications were listed as Atorvastatin, a statin for high cholesterol, Clopidogrel, a blood thinner, Hydrocholorothiazide, a diuretic, aspirin, folic acid, Diazepam, a sedative for anxiety, vitamin D, Lyrica, a nerve pain medication, Tramadol, a narcotic pain medication, Sertraline, an SSRI for depression, and Metoprolol, a beta blocker. Id. Plaintiff reported she was a "former smoker" who last smoked "6-12 months" ago. Id. at 995. Plaintiff's diagnoses were "[u]nspecified peripheral vascular disease" with a note that "[Plaintiff] does not have signs of resting ischemia but does have a very short claudication distance" and that Plaintiff was referred to another doctor for an "angiography and possible intervention;" "[e]ssential hypertension, benign" and Plaintiff's "[blood

pressure] is at goal, continue present management;" and "[o]ther and unspecified hyperlipidemia" that Plaintiff would "work on this further after treatment of her [peripheral artery disease] is done." Id. at 996.

On January 2, 2013, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for follow up on right shoulder pain and decreased [range of motion]. [Plaintiff] reports symptoms of pain and weakness are still the same." Id. at 895-96. Plaintiff also "reports some heart palpitations that are intermittent over the past week ... does admit[] to intermittent shortness of breath which is her baseline being a smoker for so many years." Id. at 895. An EKG showed "[premature atrial contractions], and a possible 2nd degree heart block[.]" Id. at 896. Plaintiff's diagnoses were listed as "[s]upraspinatus tendon tear as appeared on MRI" and Dr. Farrag consulted with another doctor for treatment; "[a]bnormal heart rhythm, possible 2nd degree heart block Mobitz" and Dr. Farrag "sen[t] [Plaintiff] over to the ER for immediate eval[uation] by cardiology and possible admission[;" "[n]europathic pain of both legs, chronic," with a prescription for Lyrica, a nerve pain medication; and additional prescriptions for Atorvastatin, a statin for high cholesterol, and Diazepam, a sedative for anxiety. Id.

On January 6, 2013, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center and was "coming in for follow up post hospitalization, she had an [ultrasound] of the lower extremity arterial system which showed significant blockage[.]" Id. at 896-97. Upon examination, "[a] 14 point review of symptoms was negative except for: vascular system[.]" Id. at 897. Plaintiff's diagnoses were listed as "[a]bdominal aortic stenosis," and Dr. Farrag consulted with another doctor for treatment; and "hypertension" that was "[c]ontrolled, continue current management" with Metoprolol Tartrate, a blood pressure medication. Id.

On January 9, 2013, Plaintiff visited Advocate Good Shepherd Hospital for a "consult []for lower extr[e]m[i]ty angio[.]" Id. at 977-78. Plaintiff "has history of [peripheral vascular disease] and recent ultrasound demonstrating anastomotic strictures at the distal femoral attachments. She presents today with increasing claudication of the lower extremities." Id. at 978. Plaintiff's treatment plan was to obtain a "[l]ower extremity angiography with possible angioplasty." Id.

On January 16, 2013, Plaintiff visited Advocate Good Shepherd Hospital for an "abdominal aortogram" due to "angiogram bilater[al] lower extremities" and a "bilateral lower extremity runoff and angioplasty" due to "claudication[.]" Id. at 988-90. These tests showed "[s]ignificant stenoses involving the aortobifemoral graft involving the proximal attachment site and right distal attachment site" and the angioplasty was "[s]uccessful[.]" Id. at 990.

On February 6, 2013, Plaintiff visited Northwest Cardiology Associates with "[l]ower extremity claudication[.]" Id. at 1044-46. Plaintiff complained of "numbness, heaviness, and tingling which occur while walking and start walking as little as 15-20 feet. The symptoms are relieved by rest and sometimes if she dangles her legs over the side of the bed. ... Upon further questioning it appears that her symptoms are present at rest and with activity. She has proximal lower extremity muscle weakness when she stands up. She also has parasthesias and cramps at rest and with activity." Id. at 1044. Plaintiff's current medications were listed as aspirin, Hydrocholorothiazide, a diuretic, Clopidogrel, a blood thinner, Atorvastatin, a statin for high cholesterol, Metoprolol, a beta blocker, Sertraline, an SSRI for depression, Tramadol, a narcotic pain medication, Lyrica, a nerve pain medication, vitamin D, Diazepam, a sedative for anxiety, and folic acid. Id. Plaintiff reported that "she has been seen by neurology in the past and may have been told that she has peripheral neuropathy." Id. at 1044-45. Plaintiff stated she was a "former tobacco user"

and last smoked "6-12 months" ago. Id. at 1045. Plaintiff's diagnoses were "[u]nspecified peripheral vascular disease" and based on results from a previous test, "it appears that [Plaintiff's] symptoms may be from peripheral neuropathy and not leg ischemia. Also consider that Atorvastatin may be contributing. I have advised [Plaintiff] to stop Atorvastatin for a few days;" "[e]ssential hypertension, benign" with "BP ... at goal, continue present management;" and "[o]ther and unspecified hyperlipidemia" that Plaintiff "[w]ill work on this further after treatment of her [peripheral artery disease] is done." Id. at 1045-46.

On February 14, 2013, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for follow up [status post] angioplasty with stent [p]lacement in both lower extremities, notes she is still having bilateral lower extremity pains, but notes pain is lesser than before." Id. at 1027-28. Plaintiff stated she "is feeling well[.]" Id. at 1028. Plaintiff's diagnoses were "[b]ilateral lower extremity edema, chronic, most likely due to venous insufficiency as opposed to arterial blockage" and Plaintiff was to follow up with other doctors and "[n]europathic pain of both legs" with prescriptions for Lyrica, a nerve pain medication and Diazepam, a sedative for anxiety. Id.

On February 19, 2013, Plaintiff visited Advocate Good Shepherd Hospital and underwent "[v]ascular extremity lower duplex arterial bilateral and vascular extremity lower ABI bilateral" tests. Id. at 1006-07. The tests showed "[a]bnormal ABI and toe brachial indices indicating moderate arterial insufficiency to lower extremities" and "[s]tenosis near distal anastomotic site of aortofemoral bypass graft bilaterally, more so on the left side with similar findings on previous examination. Mild decrease in velocities on the right side compared to previous examination." Id.

On March 7, 2013, Plaintiff visited Dr. Farrag at Mercy Barrington Medical Center "for a

preoperative consultation at the request of Dr. Asellmier, who will perform a [l]ower extremity angioplasty." Id. at 1025-. Plaintiff reported that she "[q]uit smoking 11 month ago[.]" Id. at 1026. Plaintiff's current medications were listed as folic acid, vitamin D, Lyrica, a nerve pain medication, Diazepam, a sedative for anxiety, Metoprolol, a beta blocker, Atorvastatin, a statin for high cholesterol, Sertraline, an SSRI for depression, Clobetasol, a corticosteroid, Clopidogrel, a blood thinner and aspirin. Id. Plaintiff was "[c]leared for surgery[.]" Id. at 1027.

On March 11, 2013, Plaintiff visited Advocate Good Shepherd Hospital for an "abdominal aortogram and bilateral lower extremity runoff and angioplasty." Id. at 1015-18. The tests showed "[s]ignificant stenoses involving the distal aortobifemoral graft attachment sites bilaterally[,]" "[s]uccessful bilteral angioplasty[,]" "[m]ild, stable stenosis of the proximal aorto-bifemoral attachment site[,]" and "[t]wo vessel runoff on the left; [t]hree vessel runoff on the right." Id. at 1017-18.

On March 15, 2013, Plaintiff visited Advocate Good Shepherd Hospital for a chest x-ray due to her "smoking [history]." Id. at 1022. The x-ray showed "[h]yperinflation without acute findings." Id.

On March 16, 2013, Plaintiff attended a social security hearing before ALJ Daniel Dadabo. Id. at 87-118. During the hearing, Plaintiff stated that she would be undergoing surgery again the following Monday, and the ALJ decided "to wait for the hospital records." Id. at 115. The ALJ also discussed changing the alleged onset date, although he "[didn't] want to make the client adjust her onset date. That has to be something that they want to do. They have to make an informed decision about it." Id. at 116. The ALJ did not consult a vocational expert at this hearing. Id. at 87-118.

On April 5, 2013, Candace Giles, the president of a dog rescue organization, submitted an

61

affidavit on Plaintiff's behalf. Id. at 291. Ms. Giles wrote that Plaintiff volunteered with her organization "in 2009 and 2010" fostering dogs in her home and that "[i]n June 2010, after our area had a flood, [Plaintiff] suddenly stopped volunteering, without explanation. We took back seven dogs from [Plaintiff] on very short notice. ... [Plaintiff] never volunteered for us again after June 2010." Id.

On April 18, 2013, Plaintiff visited Advocate Good Shepherd Hospital for a "[v]ascular extremity lower duplex arterial bilateral" test that showed "[i]ncreased velocities at distal aortofemoral graft bilaterally, right more than the left. Improvement accn on the left side with decreased velocities compared to previous examination" and "[n]o significant stenosis in the femoral and popliteal arteries bilaterally[.]" Id. at 1035.

On June 11, 2013, Plaintiff visited Dr. John Salyer at Dickson Medical Associates to "establish [primary care physician]" because she "[r]ecently moved from Illinois" and she "needs med refills." Id. at 1048-52. Plaintiff's diagnoses were listed as "peripheral vascular disease" with a note that "[t]he symptoms began 2 years ago. The symptoms are reported as being severe. She states the symptoms are stable;" "[b]enign essential hypertension" with a note that "onset [was] 06/11/1993. Positive for following diet and using tobacco (less than 1/2 [pack per day]). Negative for checking BP at home, exercising, losing weight, reducing alcohol, having new symptoms and medication issues;" and hyperlipidemia. Id. at 1048. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 1049. Plaintiff reported that she smoked "8 cigarettes" per day for thirty years and quit in 2012. Id. Plaintiff's current medications were listed as aspirin, Atorvastatin, a statin for high cholesterol, Clopidogrel, a blood thinner, Diazepam, a sedative for anxiety, Hydrocodone, a opiod pain medication, Metoprolol, a beta blocker and vitamin D. Id. at 1049-50. Upon

examination, Plaintiff showed claudication and joint pain. Id. at 1050.

On June 25, 2013, Plaintiff visited Dr. Vera Huffnagle at Dickson Medical Associates complaining of "[u]nspecified idiopathic peripheral neuropathy." Id. at 1053-57. Plaintiff stated that onset was "5 years ago. Severity level is moderate-severe. It occurs constantly and is worsening. Location: legs. The pain radiates to the hips. The pain is aching, burning, dull, piercing, sharp and throbbing. The pain is aggravated by bending, climbing (and descending) stairs, lifting, movement, pushing, sitting, walking and standing. The pain is relieved by elevation, pain/[prescription] meds and Aspirin ... daily. Associated symptoms include decreased mobility, difficulty initiating sleep, joint instability, joint tenderness, limping, nocturnal awakening, nocturnal pain, numbness, spasms, swelling, tingling in the legs and weakness. Additional information: [right] leg 'seems to be worse than my left' per [Plaintiff]. [Plaintiff] states legs were 'better for about two weeks after carotid surgery,' 2/2012. Legs have worsene[d] since that time." Id. at 1053. Plaintiff claimed she had "[n]ever [been a] smoker." Id. at 1054. Plaintiff's current medications were listed as aspirin, Atorvastatin, a statin for high cholesterol, Clopidogrel, a blood thinner, Diazepam, a sedative for anxiety, folic acid, Hydrocholorothiazide, a diuretic, Hydrocodone, a opiod pain medication, Lyrica, a nerve pain medication, Metoprolol, a beta blocker, Tramadol, a narcotic pain medication, and vitamin D. Id. at 1054-55. Upon examination, Plaintiff was positive for nocturnal pain, difficulty initiating sleep, focal weakness, gait disturbance, nocturnal awakening, numbness, paresthesia, psychiatric symptoms, tingling in the legs, swelling, back pain, decreased mobility, joint instability, lumping, spasms and weakness. Id. at 1055. A lumbar spine x-ray and a cervical spine x-ray were ordered. Id. at 1057.

Following this appointment, Plaintiff underwent lumbar spine radiographs. Id. at 1086.

63

These showed "[m]inimal lumbar spondylosis. Levoscoliosis as above." Id. Plaintiff also underwent cervical spine radiographs that showed "[m]id cervical degenerative changes. No fracture demonstrated." Id. at 1087.

On July 15, 2013, Plaintiff visited Dr. Salyer at Dickson Medical Associates. Id. at 1058-61. Plaintiff's diagnoses were listed as hypertension, hyperlipidemia and pain with a note that "[t]he symptoms began 4 months ago and generally lasts varies. The symptoms are reported as being severe. The symptoms occur randomly. The location is behind left ear. She states the symptoms have worsened. Pain getting more frequent with spells of dizziness [at] time of pain, with some nausea." Id. at 1058. Plaintiff admitted she was a "[c]urrent every day smoker." Id. at 1059. Plaintiff's current medications were listed as aspirin, Atorvastatin, a statin for high cholesterol, Clopidogrel, a blood thinner, Diazepam, a sedative for anxiety, Hydrocodone, a opiod pain medication, Lyrica, a nerve pain medication, Metoprolol, a beta blocker, Promethazine, an antihistamine, and vitamin D. Id.

On July 24, 2013, Plaintiff visited Dickson Medical Associates with multiple complaints. Id. at 1062-66. Plaintiff's first diagnosis was "[u]nspecified idiopathic peripheral neuropathy" and Plaintiff was going to be scheduled for an "autonomic nerv[e] function test;" Dr. Huffnagle "suspect[ed] ischemic neuropathy[.]" Id. at 1062. Plaintiff was also diagnosed with "[l]umbago" and it was noted that she "did not follow through with therapy yet. Need to restart post August 1," and that she needed to stop Atorvastatin; rheumatoid arthritis; peripheral vascular disease; and hypophosphatemia. Id. Plaintiff claimed she had "[n]ever [been a] smoker." Id. at 1064. Plaintiff's current medications were listed as aspirin, Atorvastatin, a statin for high cholesterol, Clopidogrel, a blood thinner, Diazepam, a sedative for anxiety, folic acid, Hydrochlorothiazide, a diuretic,

Hydrocodone, a opiod pain medication, Lyrica, a nerve pain medication, Metoprolol, a beta blocker, Promethazine, an antihistamine, Tramdol, a narcotic pain medication, and vitamin D. Id. Upon examination, Plaintiff was positive for nocturnal pain, difficulty initiating sleep, focal weakness, gait disturbance, nocturnal awakening, numbness, paresthesia, psychiatric symptoms, tingling in the legs, swelling, back pain, decreased mobility, joint instability, joint tenderness, limping, spasms and weakness. Id. at 1065. Plaintiff underwent an "[e]lectromyography and nerve conduction study" that showed "an abnormal recording." Id. at 1066. The note is incomplete and states "[t]his finding is consistent with The severity level is moderate." Id.

Following this appointment, Plaintiff underwent a series of studies including a motor nerve study, a sensory nerve study, a reflex study and an EMG study. Id. at 1092-93. The results of the "[n]erve conduction studies revealed slowed bilateral tibial motor conduction velocities. Both [Hoffmann's] reflexes are long" and "lower extremity demyelinating motor neuropathy." Id. at 1093.

On July 26, 2013, Plaintiff visited Dr. Jim Bob Faulk at The Surgical Clinic "for evaluation of [peripheral artery disease]. She has an extensive vascular history. She is a heavy smoker[.]" Id. at 1039-40. Plaintiff "says her legs today bother her just as much as they did before her very first operation. She complains of numbness and pain in the legs worse with ambulation but also present at rest." Id. at 1039. Plaintiff's current medications were listed as Plavix, a blood thinner, Metoprolol, a beta blocker, Atorvastatin, a statin for high cholesterol, aspirin, folic acid, vitamin D3, vitamin B12, Valium, a sedative for anxiety, Hydrocodone, an opiod pain medication and Phenergen, an antihistamine. Id. Plaintiff admitted she was a "current smoker" and was "[c]ounseled ... on the dangers of tobacco use and urged to quit." Id. Upon examination, Plaintiff reported night sweats,

fever, fatigue, chest pain, palpitations, swelling hands/feet, that she was easily bruised, muscle pain/cramps, stiffness/swelling joints, joint pain, and trouble walking. Id. at 1039-40. Plaintiff's diagnosis was "[a]therosclerosis native arteries of the extremities [with] rest pain[,]" although in terms of treatment "[t]his is a difficult problem that we really do not have any records of what has been done. I will try to obtain records from the hospital in Illinois and will obtain arterial duplex with [ankle/brachial index] to see what we are starting. She will likely need a CTA at some point." Id. at 1040.

On August 6, 2013, Plaintiff visited Dr. David Blazer for a consultation requested by Dr. Salyer. Id. at 1067-69. Plaintiff "complains of chest discomfort. The pain began 2 weeks ago. It occurs 5 times a day. It generally lasts 15 minutes. [Plaintiff] rates the pain as severe. This is acute in nature." Id. at 1067. Plaintiff was referred for "[chest pain], [shortness of breath], Nausea and dizziness. ... [Chest pain] has been x 2 weeks. [Complains of] leg pains also." Id. Plaintiff's current medications were listed as aspirin, Clopidogrel, a blood thinner, Diazepam, a sedative for anxiety, folic acid, Hydrochlorothiazide, a diuretic, Hydrocodone, a opiod pain medication, Lyrica, a nerve pain medication, Metoprolol, a beta blocker, Phospha, Promethazine, an antihistamine, Tramdol, a narcotic pain medication, and vitamins B12, D2 and D3. Id. Upon examination, Plaintiff was noted to have an edema and to be obese. Id. at 1068. A lipid profile, a myocardial perfusion study, and a 2-D echocardiogram were ordered. Id. Plaintiff's prescriptions for Clopidogrel, Diazepam, Hydrocodone, aspirin and Lyrica were discontinued. Id.

On August 9, 2013, Plaintiff returned to Dr. Blazer for her test results; Plaintiff was noted to have an "unremarkable echocardiogram." Id. at 1070-72. Plaintiff's current medications were listed as aspirin, Atorvastatin, a statin for high cholesterol, Clopidogrel, a blood thinner, Diazepam,

a sedative for anxiety, folic acid, Hydrocodone, a opiod pain medication, Lyrica, a nerve pain medication, Metoprolol, a beta blocker, Phospha, Promethazine, an antihistamine, Sertraline, an SSRI for depression, Tramdol, a narcotic pain medication, and vitamins B12, D2 and D3. Id. at 1070-71. Upon examination, Plaintiff was positive for chest pain and was noted to be overweight. Id. at 1071. Plaintiff's diagnoses were listed as peripheral vascular disease, hypercholesterolemia that was "[i]nadequately controlled[,]" hypertension that was "benign," chest pain with a note that "[a] recent stress test showed no significant ischemia" and tobacco abuse with a note that "[Plaintiff] was instructed on smoking cessation." Id. at 1071. A lipid profile and a liver function test were ordered, and Plaintiff's medications were changed to a higher dose of Atorvastatin, a prescription for Chantix, a smoking cessation medication and hydrocholorothiazide, a diuretic, was discontinued. Id. at 1071-72.

Following this appointment, Plaintiff underwent a nuclear cardiology exam that consisted of a "[p]harmacological stress test with adenosine challenge, dual isotope myocardial perfusion SPECT imaging study and gated wall motion analysis." Id. at 1088. The results showed "[n]ormal nuclear perfusion study" and "[n]ormal wall motion study." Id. Plaintiff also underwent a transthoracic echocardiogram that showed "[n]ormal chamber dimensions," "[n]ormal left ventricular systolic function," "[n]ormal valvular structures," "[u]nremarkable doppler study" and "[n]o pericardial effusion." Id. at 1089.

On August 13, 2013, Plaintiff visited Dickson Medical Associates for a bilateral lower extremity arterial doppler study. Id. at 1090. The study showed "[m]oderate bilateral lower extremity arterial insufficiencies by ankle brachial indices although waveform being monophasic suggests possibly more severe degree of stenosis. Recommend CT angiography of the lower

67

extremities to better define anatomy and severity of disease." Id.

On August 14, 2013, Plaintiff visited Dr. Huffnagle at Dickson Medical Associates for treatment of "unspecified idiopathic peripheral autonomic neuropathy." Id. at 1073-78. An ANSAR test from August 13, 2013 was listed, that showed "orthostasis on stand" and "Sym > PS neuropathy." Id. at 1073. Plaintiff was instructed to "[p]ush oral fluids." Id. Plaintiff's diagnoses were listed as "[l]umbago" that could "not start due to arterial insufficiency. Will visit [physical therapy] shortly;" "[u]nspecified vitamin d deficiency" and a follow up appointment was scheduled; "Hepatitis C" with a note that Plaintiff "has hep B as well;" "[r]heumatoid arthritis;" and "[p]eripheral vascular disease" and it was noted that although this office discontinued Plaintiff's Atorvastatin, it was restarted at a higher dose by Dr. Blazer and the doctors would need to discuss it. Id. at 1073-74. Plaintiff claimed she had "[n]ever [been a] smoker." Id. at 1075. Plaintiff's current medications were listed as aspirin, Atorvastatin, a statin for high cholesterol, Chantix, a smoking cessation medication, Clopidogrel, a blood thinner, Diazepam, a sedative for anxiety, folic acid, Hydrocodone, a opiod pain medication, Lyrica, a nerve pain medication, Metoprolol, a beta blocker, Phospha, Promethazine, an antihistamine, Sertraline, an SSRI for depression, Tramdol, a narcotic pain medication, and vitamins B12, D2 and D3. Id. at 1075-76. Upon examination, Plaintiff was positive for nocturnal pain, difficulty initiating sleep, focal weakness, gait disturbance, nocturnal awakening, numbness, paresthesia, psychiatric symptoms, tingling in the legs, swelling, back pain, decreased mobility, joint instability, joint tenderness, limping, spasms and weakness. Id. at 1076. Plaintiff was noted to be "overweight" and to have "stiff movements." Id. at 1077.

On August 23, 2013, Plaintiff visited Dr. Faulk at The Surgical Clinic for "[follow up] with arterial duplex [with] [ankle/brachial index]." Id. at 1041-42. Plaintiff's "Doppler study shows

ankle-brachial indices of 0.6 bilaterally. ... She continues to have the same symptoms." Id. at 1041.

Plaintiff's current medications were listed as Plavix, a blood thinner, Metoprolol, a beta blocker,

Atorvastatin, a statin for high cholesterol, aspirin, folic acid, vitamin D3, vitamin B12, Valium, a

sedative for anxiety, Hydrocodone, an opiod pain medication, Phenergen, an antihistamine and

Chantix, a smoking cessation medication. Id. Plaintiff's diagnosis was "[a]therosclerosis native

arteries of the extremities [with] rest pain" and Dr. Faulk "will obtain additional records. We are

going to schedule her for a CTA to see exactly what the problem is." Id. at 1042.

On September 4, 2013, Plaintiff participated in a second SSA hearing with ALJ Dadabo.

Id. at 47-86. At this hearing, Plaintiff's attorney questioned the vocational expert regarding

Plaintiff's alleged neuropathy. Id. at 76-82. During this discussion, the vocational expert stated that

he was not familiar with the ANSAR test and could not comment on its effectiveness or its results.

Id. at 80-84. Plaintiff's attorney asserted that "this particular test is before the date last insured and

is kind of crucial to the case[.]" Id. at 82. The ALJ left the record open for thirty days so that

Plaintiff could submit additional information about the ANSAR testing. Id. at 84. Later that

afternoon, the ALJ conducted a third hearing with a vocational expert. (Docket Entry No. 21 at

1144-52).

On October 2, 2013, Dr. Julian Freeman submitted a "narrative" regarding Plaintiff's social

security claim. (Docket Entry No. 20 at 1099-1107). The cover sheet submitted by Plaintiff

describes the narrative as "address[ing] the medical acceptability of the ANSAR testing [] discussed

at the supplemental hearing." Id. at 1098. Dr. Freeman reviewed "all medical data in the Social

Security claim file[.]" Id. at 1099. Dr. Freeman summarized Plaintiff's medical records, then

considered Plaintiff's many diagnoses. Id. at 1099-1103. Dr. Freeman wrote that "[t]he basic

69

diagnoses resulting in later functional loss were evident very early in the diagnostic data. These diagnoses were correctly diagnosed by some of the treating physicians, but overlooked by others, or their implications misinterpreted due to limitations in experience or insight." Id. at 1103. Dr. Freeman listed Plaintiff's Hepatitis C diagnosis and treatment, and wrote that "[t]his treatment was associated with the acute onset of symptoms of sensory and autonomic neuropathy, primarily in the form of sensory dyseshesias and paresthesias, and marked fatigue. This complication of interferon use for hepatitis C has been recognized since at least the late 1990s. The onset of the neuropathy is fairly sudden and rapid in this setting." Id. Dr. Freeman references an academic paper, but does not refer to the record. Id.

Dr. Freeman is critical of Plaintiff's treating physicians. Regarding the source of Plaintiff's neuropathy he wrote, "these laboratory abnormalities are not incidental and inconsequential abnormalities. The sedimentation rates were normal and did not 'match' or parallel the C-reactive protein changes. However, on all occasions, mild polycythemia was present which precludes an accurate sedimentation rate study, even if it were done in the correct technical manner." Id. at 1104. Regarding a diagnosis of spinal stenosis and inflammatory change, Dr. Freeman wrote that "[n]ot recognized by the physicians at the time, the underlying post-interferon neuropathy was at least as much a cause of this process, as was the actual spinal stenosis." Id. Regarding Plainitff's aortic bypass, Dr. Freeman wrote that "[t]he reports are not entirely clear as to whether the bypass was attempted due to the presumption that the leg pain was ischemic claudication, or as a precautionary measure. Although not clearly an incorrect treatment, aortic bypass often is not performed in this situation due to the extensive collateral flow that already was present, the severe neuropathy already limiting ambulation, and the potential for complications from the procedure." Id.

Dr. Freeman opined that Plaintiff had an impairment or combination of impairments that medically equaled the severity of Listing 4.12.D. Id. at 1105. Dr. Freeman opined:

> This section **(4.12.D) is equaled** because vascular claudication would have occurred if the individual had not been so limited in walking due to the neuropathy[.] The limitations of vascular supply could not be reached, due to this additional pathology. The alternative view, that the pain was and is due to vascular claudication, also can be taken as an alternative diagnosis, but as discussed above, that is not likely to be a correct causal diagnosis with regard to the current and previous pain[.] If that view is taken, however, then 4.12.D is met. In either event, **onset under the listing** (meeting or equaling) **is at least as early as 3/08** even though the Doppler studies were only somewhat worse than the listing prior to surgery, and slightly worse than the listing afterwards. The reason for this date of onset primarily arises from the details of the angiographic findings prior to the aortic bypass. The findings described are the end result of an old, well-established near-total aortic obstruction that has been present for some years. The background of underlying diabetes (although mild) since at least 2008, and onset of the pain at a very definite date in March 2008 place onset at that point, whether or not one considers the pain to be neuropathic, circulatory, or a mixture of the two. Regardless of the cause of the *pain*, the marked vascular insufficiently and extensive aortic obstruction certainly were present in early 2008, based on the later angiographic picture.

Id. (emphasis in original).

Dr. Freeman also opined that Plaintiff met Sections 11.08, 11.14, 14.06A and 14.09B.

> **Section 11.08 is met with onset 3/08** based on the diffuse spinal root involvement, with a significant and persistent limitation in gait and station dating to 3/08. One aspect of the neuropathy not noted in the EMG report, is that this type of neuropathy usually involves the spinal roots as well. While nerve root compression and direct anatomic irritation by spinal stenosis explain some of the EMG abnormalities reported in the first EMG study, many of these are at levels that differ from those where spinal stenosis is present. The extremely high frequency of diffuse root involvement in the type of neuropathy described is a clear explanation for the more diffuse nature of the EMG findings.

> Similarly, **11.14 is met since 3/08** by a peripheral neuropathy with sensory, motor, and autonomic features demonstrated by NCV, EMG, clinical symptoms, and autonomic testing, with probably onset in 3/08 based both on known associated with treatment course, and medical history. Since that date, at the very least, a significant and persistent limitation of gait and station (i.e., precluding the exertional demands of heavy work) has been present.

Listing section 14[.]06 and 14.09 also are relevant, as indicated by the diagnostic discussion above. The positive RA titer and elevated C-reactive protein levels confirm the presence of an autoimmune disorder[.] The intermittent low platelet count, intermittent protime elevation, and specific type of neuropathy noted are additional confirmations of this process, as were the spinal joint synovitis, and later, the tendinopathy at the shoulder. The spinal joint synovitis, in particular, is not a degenerative process, but a manifestation of inflammatory arthritis. Sections **14.06.A and 14.09.B both are met** by multisystem (joint, nerve) invovlement with severe malaise, fatigue, involuntary weight loss (until the last year), and intermittent unexplained fevers. Onset under these listing sections also would be placed at **3/08**, when the neuropathy made its appearance. The 2009 MRI is indicative of inflammatory joint involvement since that date, as well.

Id. at 1106.

Dr. Freeman assessed Plaintiff's functional limitations since March 2008 as: "walking and standing an hour a day in periods not exceeding about 1-2 minutes each, or about 200 feet at one time, at slow pace, with climbing of a few steps slowly, sitting 5-6 hours a day, no frequent lifting, carrying, pushing, pulling, occasional such activities of a few lbs, rare such activities of 10 lbs, rare postural changes of all types (not exceeding 10% of the time) except only minimal bending, no walking on rough or uneven terrain, with more recent impairments due to hand function and mental function losses added after 2010." Id. at 1106-07. Despite "[t]he near-total absence of medical data prior to 3/08," Dr. Freeman opined that "from 1/06 to 3/08" Plaintiff was restricted to "walking and standing 2-3 hours a day in periods not exceeding about 15 minutes each, or 2 blocks in distance feet at one time, at slow pace, with climbing of a flight of stairs slowly, sitting 6-8 hours a day, no frequent lifting, carrying, pushing, pulling, occasional such activities of 5 lbs, rare such activities of 20 lbs, occasional postural changes of all types." Id. at 1107.

On November 27, 2013, the ALJ issued a partially favorable decision. Id. at 23-46. The ALJ determined that Plaintiff was not disabled through December 31, 2010, the date last insured, for the

purposes of Disability Insurance Benefits. Id. at 40. The ALJ determined that Plaintiff was disabled for purposes of Supplemental Security Income beginning on October 1, 2011. Id. On February 9, 2015, the Appeals Council denied Plaintiff's request for review. Id. at 10-14.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of Listings 11.14 and 11.08, (2) incorrectly weighing the opinions of Dr. Semerdjian and Dr. Freeman, (3) discrediting Plaintiff's testimony regarding pain, and (4) conflating mild to moderate difficulties in maintaining

concentration, persistence, and pace with simple and repetitive work.

Plaintiff first finds error in the ALJ's determination that Plaintiff did not meet Listings 11.14

or 11.08. Listing 11.14 states:

> 11.14 Peripheral neuropathies. With disorganization of motor function as described in 11.04B, in spite of prescribed treatment.

20 C.F.R. § Pt. 404, Subpt. P, App 1, § 11.14.

Listing 11.04B states:

> Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movement, or gait and station (see 11.00C).

20 C.F.R. § Pt. 404, Subpt. P, App 1, § 11.04B.

Listing 11.00C states:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. § Pt. 404, Subpt. P, App 1, § 11.00C.

As stated above, "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." Id. Plaintiff has not claimed that she experienced any interference with the use of her fingers, hands, and arms. Plaintiff asserts a general neuropathy, not limited to interference with locomotion, that she attributes to the Interferon medication used to treat her Hepatitis C. On March 28, 2008, during treatment for Hepatitis C, Plaintiff reported "bilateral leg numbness and tingling that lasts about ten minutes. She

gets this every other day but when she gets it she cannot walk. She is not diabetic." (Docket Entry No. 20, Administrative Record, at 506). Plaintiff's doctor noted that "[i]f this is coming from her therapy it is a very rare side effect." Although the doctor offered to reduce the dosage of Interferon, he noted that "[t]he patient does not really want to dose reduce and would like to push on as much as possible." Id. Plaintiff asserts that her alleged neuropathy is a side effect of the Interferon treatment.[2]

Plaintiff complained of neuropathy on several occasions and to several different treatment providers; several tests also confirmed the presence of neuropathy. Id. 428-30, 645-46, 349-50, 852, 892-93, 1045-46, 1053-57, 1062-66, 1093, 1073-78. Yet, only Plaintiff and the gastroenterologist mentioned above have connected Plaintiff's Interferon treatments and Plaintiff's neuropathy; other physicians attributed the neuropathy to diabetes, herniated disks, the medication Atorvastatin, and degenerative disc disease.

Plaintiff's treating physicians at Dickson Medical Associates addressed Plaintiff's neuropathy in depth only once, on May 20, 2009. Id. at 435-37. It was noted that Plaintiff underwent "Interferon treatment for hepatitis in 1-08 to 6-08 and symptoms started then and have gotten worse." Id. at 436. However, the doctor did not attribute the condition to Interferon treatment or consult with a neurologist. Instead, the doctor ordered "[physical therapy] first. Cymbalta now. Consider [epidural steroid injections] at both joints at L3-L4 vs L5-S1 disc injection." Id. Plaintiff was also

---

[2]Plaintiff cites to an article in World Journal of Gastroenterology dated January 14, 2008. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2675134/. The abstract notes that "peripheral neuropathy including demyelinating polyneuropathy related to Peg-IFN is extremely rare." The abstract also states that such a diagnosis must be "immediate[ly] referr[ed] to a neurologist for the confirmation of diagnosis, management, and the prevention of long-term neurological deficits."

noted to have "neuropathy peripheral autonomic idiopathic" but the assessment plan states that the "ANSAR 5-09 was good" and the treatment plan is to have another ANSAR test in "5-10." Id. at 437. These notes are repeated throughout Plaintiff's treatment record at Dickson Medical Associates, but the record does not indicate that any additional treatment or testing were ever administered.

On August 11, 2009, Plaintiff visited Dr. Khan W. Li for a consultative examination. Id. at 489-90. Dr. Li "had a long discussion with [Plaintiff] regarding her peripheral neuropathy and her neuropathic-type pain. She states that this really started after she started undergoing treatment for hepatitis C with peginterferon. I am not very familiar with the interferon medications, but I do know that some of them can cause a peripheral neuropathy, and given the timing of her infusion I suspect that this is the cause. I certainly do not think there are any surgical interventions necessary for treatment of her lower extremity pain. Her MRI is essentially normal." Id. at 490.

Plaintiff has also submitted a detailed narrative from Dr. Freeman, criticizing Plaintiff's treatment and opining that Plaintiff does suffer neuropathy due to Interferon treatment. Id. at 1099-1107. Dr. Freeman writes that the connection was "not recognized by [Plaintiff's] physicians at the time." Id. at 1104.

The ALJ considered Dr. Freeman's opinion and the other evidence in the medical record. The ALJ wrote that:

> [Dr. Freeman] hypothesized on the basis of subjectively-asserted neuropathic symptoms present since [March 2008]. He indicates that the precise etiology (circulatory) is less important than the symptoms, which is specious. He also hypothesized that Hepatitis C and its treatment is known to produce neuropathic symptoms based upon the medical literature, which is misleading because the treating gastroenterologist documented no such symptoms and indicated that the claimant was doing well almost from the beginning of treatment.

Id. at 31.

The ALJ compared this hypothesis to "the inference of neurosurgeon Khan Li, M.D. that he

could not establish a medical etiology for the claimant's symptoms, even assuming the possibility

of neuropathic pain." Id. The ALJ also wrote that Plaintiff's complaints of "lower extremity pain,

numbness and tingling" were treated "with a number of narcotic medications, neuroleptics and

muscle relaxants including Lidoderm patch, Zoloft, Elavil and Skelaxin, [and] [Plaintiff] was not

a surgical candidate or even a candidate for myelography, implying that the etiology (medical cause)

of her discomfort was not acute or critical." Id. at 33. The ALJ reiterated: "neurosurgeon Khan Li,

M.D., specifically had concluded that the claimant's MRI, discussed above, was unremarkable and

normal for her age. He hypothesized that Interferon treatment might have produced neuropathic

pain, but as discussed above, the gastroenterologist had not commented upon such symptoms,

making it probable that liver treatment did not cause neuropathic pain. Therefore, the claimant had

not established at etiology for alleged symptoms preceding insured status expiration." Id.

The ALJ thoroughly discussed Plaintiff's neuropathy and the alleged connection between the

Interferon treatments and Plaintiff's neuropathy. The evidence in the record does not contradict the

ALJ's conclusion. Only two examining doctors connected Plaintiff's neuropathy with the Interferon

treatments – first, the office administering the treatment who stated that "[i]f this is coming from her

therapy it is a very rare side effect" and second, the consultative examiner who stated that "some of

[the Interferon treatments] can cause a peripheral neuropathy, and given the timing of her infusion

I suspect that this is the cause" but also noted that Plaintiff's MRI was normal and surgery was not

indicated. Based on the medical record, the ALJ made a reasonable determination that there was no

connection between Plaintiff's neuropathy and her Interferon treatments, and that Plaintiff's

neuropathy did not rise to the level of a listed impairment.

Next, Plaintiff alleges that the ALJ erred in the weight assigned to the opinions of Dr.

Freeman and Dr. Semerdjian. Dr. Semerdjian was the medical expert present at Plaintiff's second

SSA hearing. The ALJ assigned Dr. Semerdjian's opinion "substantial weight, as it is thorough and

detailed, and he had the opportunity to review the entire record." Id. at 30. The ALJ also wrote that:

> Greater weight is given to the medical opinion of Dr. Semerdjian, who inferred that
> the claimant met the requirements of Listing 4.12 as of November 2011. He relied
> upon December 2011 Doppler studies, which was objective evidence of severe
> medical restriction. He concluded that after this date, claudication problems
> persisted and the claimant developed additional medical impairments. His
> conclusions are well-supported and consistent with chronic occlusion documented
> after this date. He also inferred that before November 2011, the claimant appeared
> able to do light work, subject to occasional postural limitations, including occasional
> stooping[,] crouching, crawling, kneeling and balancing, no ladders, ropes or
> scaffolds and no slippery surfaces. In contrast to Dr. Freeman's assessment, these
> observations are measured, finite in their scope and reasonable when considered
> against the medical record as a whole. The undersigned assigns these judgments
> substantial weight, although the undersigned will infer restriction severity one month
> earlier than Dr. Semerdjian on the basis of October 2011 diagnostic MRI and
> EMG/NCV discussed above.

Id. at 36.

Regarding Dr. Freeman's opinion, the ALJ wrote that "Julian Freeman, M.D., who reviewed

the file but does not seem to have examined the claimant (i.e., his opinion in that vein is not entitled

to greater weight than that of Dr. Semerdjian, who did not examine the claimant but had the

opportunity to observe her and listen to her testimony) inferred that the claimant's impairments

equaled Listing 4.12 as of March 2008. ... Specifically, Dr. Freeman's opinion merits limited weight,

including his judgment that she only could stand and walk two minutes at a time since March 2008."

Id. at 30, 36.

The ALJ considered Dr. Freeman's opinion at length:

He hypothesized on the basis of subjectively-asserted neuropathic symptoms present since that date. He indicates that the precise etiology (circulatory) is less important than the symptoms, which is specious. He also hypothesized that Hepatitis C and its treatment is known to produce neuropathic symptoms based upon the medical literature, which is misleading because the treating gastroenterologist documents no such symptoms and indicated that the claimant was doing well almost from the beginning of treatment.

Dr. Freeman notably conceded that no musculoskeletal Listing, such as 1.04A could be satisfied on the basis of subjective symptoms because the claimant was able to walk *briskly* at [the] February 2011 consultative examination with Donita Keown, M.D. (emphasis added). Despite the foregoing, he again was willing to consider subjectively-asserted neuropathic pain as equivalent to 1.04C listing severity, because the claimant allegedly could not walk a block at a reasonable pace. This inference is inconsistent with the inference of neurosurgeon Khan Li, M.D. that he could not establish a medial etiology for the claimant's symptoms, even assuming the possibility of neuropathic pain.

Dr. Freeman went on to infer that since March 2008, the claimant's impairments met the requirements of Listings 11.08, 11.14, 14.06 A and 14.09B (for inflammatory arthritis, though as discussed below, this diagnosis was eventually rejected). In short, he infers that the requirements of disability are met on medical considerations alone for six separate Listings systems. He also inferred that the claimant equaled Listing 12.04 because of extreme functional loss due to depression (despite not only the absence of mental status findings to support this, but also a lack of subjective complaints in the record and even express denial of depressive symptoms). The latter conclusion is outside his purview to offer a medical judgment, and therefore, is simply gratuitous. The undersigned infers that Dr. Freeman simply correlated *possible* diagnoses with medical restriction. The actual signs and findings required to establish functional severity were not present before October 2011.

...

As noted above, the record contains a medical opinion from Dr. Freeman, suggesting substantial limitations prior to October 2011. Beyond the foregoing, he also focused on weight loss of thirty pounds that the claimant later regained. She continues to weigh approximately 190 pounds. She does not have autonomic-related weight loss. His allusion to the Rheumatoid Arthritis listing is misplaced. A rheumatologist excluded the absence of that probability in October 2010, two months before insured status expired. Therein, he noted that despite a one-time elevation of the Rheumatoid Factor, there was no sign of active disease. The absence of active disease would not approach Listing severity, but implies that the individual offering the opinion may be less than impartial in offering medical conclusion.

Given Dr. Freeman's apparent willingness to assume Listing severity (as discussed above) three years before its actual documentation and sometimes even in absence of documented subjective complaints (during the relevant time period, as with her depression), the undersigned has to discount the balance of his medical analysis as improbable. Specifically, Dr. Freeman's opinion merits limited weight, including his judgment that she only could stand and walk two minutes at a time since March 2008. It seems more probable than not that if simple walking and standing were the painful obstacle that the claimant contends, animal rescue volunteer work would have ended sooner than June 2010, five years after the alleged date of disability onset. Therefore, Dr. Freeman places undue emphasis on the possibility of neuropathic pain. The clear etiology of the claimant's symptoms derives from aortic/bi-femoral occlusion categorically identified in December 2011. Even assuming slightly earlier demarcation, a favorable inference would not extend indefinitely to the period preceding insured status because of an absence of **consistent** signs, findings and diagnostic test results.

Id. at 31, 36.

Both Dr. Semerdjian and Dr. Freeman only reviewed the medical record, and neither examined Plaintiff, although Dr. Semerdjian had the opportunity to engage in a dialogue with Plaintiff at the hearing. Dr. Semerdjian's opinion is consistent with the medical record, while the basis of Dr. Freeman's opinion is that the majority of Plaintiff's treating physicians have treated her incorrectly. Dr. Freeman asserted that "[Plaintiff's] diagnoses were correctly diagnosed by some of the treating physicians, but overlooked by others, or their implications misinterpreted due to limitations in experience or insight." Id. at 1103. Dr. Freeman criticizes the treating physicians who tested Plaintiff's neuropathy using a sedimentation rate test, stating that the test had abnormalities that were "not incidental and inconsequential;" he criticized the treating physicians who diagnosed Plaintiff with spinal stenosis and inflammation as "[n]ot recogniz[ing]" the effect of Interferon treatment; and Dr. Freeman goes so far as to criticize the aortic bypass procedure as "not clearly an incorrect treatment ... [but there is] potential for complications from the procedure" due to neuropathy. Id. at 1104. Yet, Dr. Freeman's opinion is based solely on a review of the medical

record.

In summary, Dr. Freeman discounts all of Plaintiff's previous diagnoses as actually misdiagnoses of neuropathy. Yet Plaintiff does not undertake any additional testing to prove this hypothesis. Although Plaintiff did consult with Dr. Freeman for a record review, Plaintiff did not choose to consult with any examining physician, or with a neurosurgeon who could have tested Plaintiff for neuropathy. Dr. Freeman's opinion is contrary to the whole of the medical record. The Court concludes that the ALJ did not err in assigning it only limited weight.

Further, the weight given to Dr. Semerdjian's opinion does not effect the weight given to Dr. Freeman's opinion. The ALJ assigned Dr. Semerdjian's opinion "significant weight," and that is not error. Hart v. Astrue, 2009 WL 2485968 at *8 (S.D. Ohio Aug. 5, 2009) ("Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight."). All opinion evidence is evaluated considering these factors:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

20 C.F.R. § 416.927(c).

Although neither Dr. Semerdjian nor Dr. Freeman examined Plaintiff, Dr. Semerdjian's opinion was supported and consistent with the record. The Court concludes that the ALJ did not err in the weight assigned to Dr. Semerdjian's and Dr. Freeman's opinions.

Next, Plaintiff asserts that the ALJ erred by finding Plaintiff incredible regarding her complaints of pain. When evaluating the entirety of the evidence, the ALJ is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. See, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); and cf Kirk v. Sec'y of Health and Human Serv., 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. Walters, 127 F.3d at 531 (citing Villarreal v. Sec'y of Health and Human Serv., 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. See Walters, 127 F.3d at 531 (citing Bradley v. Sec'y of Health and Human Serv., 862 F.2d 1224, 1227 (6th Cir. 1988); King v. Heckler, 742 F.2d 968, 974-75 (6th Cir. 1984); and Siterlet v. Sec'y of Health and Human Serv., 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (see Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994)), and the reasons must be supported by the record (see King, 742 F.2d at 975).

Plaintiff cites SSR 96-7p that states:

In determining the credibility of the individual's statements, the adjudicator must

consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

Regarding Plaintiff's credibility, the ALJ wrote:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to October 1, 2011, for the reasons explained in this decision. For example, her objective findings do not document the severity she asserts, and inconsistent reports regarding her activities detract from her credibility regarding the alleged frequency, severity and limiting effects of her symptoms.

...

It bears remark that the claimant minimized animal rescue work she performed. At [the] initial hearing, she suggested that she took care of fifty dogs on fifteen acres, but testified at [the] supplemental hearing that many volunteers helped her with the work. She simply walked up and down a short dog-walk. Even the statement of the third person she offered to rebut the presumption of animal rescue volunteering implies that she was handling this activity independently. This detail connotes that the claimant is not able to provide accurate and specific detail, and that her impairments reasonably would not be expected to cause symptoms of the intensity, frequency and restrictiveness that she asserts.

On this point, the claimant also would minimize information that she gave to a physical therapist in November 2011. Therein, she advised the therapist that she was walking seven days a week, which would imply regular walking exercise. At [the] initial hearing, she nonetheless testified that this reference meant "only within her house." If the claimant only was walking "within her house," it seems unlikely that she would need to let the therapist know that she was doing so specifically seven times a week. It is more probable that she mentioned seven times a week specifically because the walking was not within her house, but instead represented therapeutic measures that she expressly wished to bring to the physical therapist's attention to her physical discomfort context. It again follows that if she minimized this reference, she is not able to provide accurate and specific detail, and her impairments reasonably

83

would not be expected to cause symptoms of the intensity, frequency and restrictiveness that she asserts.

(Docket Entry No. 20 at 32, 35-36).

The ALJ specifically detailed two instances that served to discount Plaintiff's credibility. The credibility determination lies with the ALJ, and here, the ALJ relied on Plaintiff's comments from the hearings to make his determination. At the initial hearing, Plaintiff's attorney questioned Plaintiff regarding the rescue work:

> Q One of your medical records mentions that you wanted to get back to doing animal rescue volunteer work.
> A Yes, ma'am. I'd love that.
> Q Can you tell us what it was that you had been doing?
> A Yes, I was rescuing animals. I worked in Burns, where I lived in Tennessee. I worked with the local animal shelters there and I would take and foster animals and keep them there until they got adopted out. I had a pretty big farm in Tennessee. I had a pretty big farm in Tennessee. I had pretty much 15 acres so I had right at 50 dogs. I had...
> Q You had what? I'm sorry.
> A Fifty dogs.
> Q Fifty dogs?
> A Yes, ma'am.
> Q Okay. That you were fostering for this?
> A Yes, ma'am.
> Q Okay. And so you'd have to walk them and things like that?
> A Walk them, feed them.
> Q Okay.
> A Run them places and as my legs kept getting worse, I had to keep cutting back and cutting back and yes, I miss it very much.
> Q When did you stop doing that?
> A I had to stop in 2010.
> Q Okay. And that, you're saying, because of your legs?
> A Yes.

Id. at 105-06.

Here, Plaintiff claims that she had a fifteen acre farm, fostered fifty dogs, and walked them and "[ra]n them places." Id. At the second hearing, after the ALJ reviewed Plaintiff's volunteer

activities and stated that it entailed "more walking and standing than your testimony would imply you are able to do," Plaintiff's attorney questioned Plaintiff about the work:

> Q Can you describe how this was set up where the dogs were kept, first of all?
> A They were kept on my farm.
> Q In the pens?
> A Yes.
> Q Okay. Were – how close were these to your house?
> A Rather close. I didn't have to walk very far to feed or water them.
> Q Did you have any volunteers?
> A Yes. I always had volunteers.
> Q How many volunteers did you have?
> A On a daily basis, maybe five to 10. Weekends it could be a lot more.
> Q How many might you have on the weekends?
> A Oh, up to 25 maybe.
> Q Okay. And so who did what? When you had the volunteers there, how did you – who did what to take care of the dogs?
> A When the volunteers come in, they're assigned a dog and they feed it, walk it, water it, clean the pen if it needed, and if they can do more than one, they take as many as they can handle. Usually, they – a volunteer will take anywhere from two to five dogs.
> Q Two to five? Okay. How common was it for you to have 50 dogs at the same time?
> A It was a little much, but basically a lot of people stepped – about that many.
> Q Okay.
> A If they've got good volunteers and stuff, then it makes it so much easier.
> Q All right. So, were you constantly at 50, or was it sometimes?
> A Oh, no, no, no. Sometimes it could be two to 50.
> Q Okay. So on a typical day, how many dogs would you feed, water, and walk?
> A Up until 2010, probably five, because I could always rely on my volunteers.
> Q Okay. And so in terms of walking them, what did that entail?
> A Well, they had a big run, so that's what I'm calling walking, but I'm taking them out of their pen and put them in a run where they wouldn't be just confined to a six by six foot little pen. They'd have a great big area.
> Q Okay. So you were walking them to that larger pen?
> A Right.
> Q How far of a walk was that for you?
> A Not very far from each of the pens, because they're all lined up right there together. I don't know about the distance.
> ...
> Q Okay. And then you would just let the dogs loose to get that?
> A Yes.

ALJ: It sounds like you – you're taking five dogs on a leash all to the run.
A No, your honor, not at once. Just one at a time.
ALJ: Okay.

Id. at 54-58.

The ALJ concluded that these stories were so different as to "connote[] that the claimant is not able to provide accurate and specific detail." Id. at 35. It is within the ALJ's discretion to determine the Plaintiff's credibility.

Further, although the ALJ determined that Plaintiff was not generally credible, he did not discount Plaintiff's pain as Plaintiff suggests. The ALJ discussed Plaintiff's allegations of pain but determined that because it was treated conservatively, the pain was not as intense as Plaintiff claimed. "In terms of medical care, it is proper to classify taking prescription medications and receiving injections as 'conservative' treatment." Hauser v. Comm'r of Soc. Sec., 2014 WL 48554 at *9 (S.D. Ohio Jan. 7, 2014). See also, Cordell v. Astrue, 2010 WL 446944 at *7, 12, 15 (E.D. Tenn. Feb. 2, 2010) (narcotic pain medication such as Percocet and psychotropic medications are "conservative treatment"). The Court concludes there is no error in the ALJ's determination that Plaintiff was not credible, nor is there error in the ALJ's consideration of Plaintiff's allegations of pain.

Finally, Plaintiff asserts that the ALJ erred by posing a hypothetical question that included a restriction to "routine, repetitive and simple tasks" instead of asking about moderate limitations in concentration, persistence, and pace. As noted in McKinzie v. Colvin, 2015 WL 4902416 at *6-7 (E.D. Tenn, Aug. 17, 2015):

Plaintiff suggests that as a result of Ealy v. Comm'r of Soc. Sec., 594 F.3d 504 (6th Cir. 2010), merely limiting a plaintiff to jobs which are "simple, routine, repetitive tasks" with no contact with the general public does not accurately describe the

plaintiff's moderate functional restrictions in concentration, persistence or pace. Thus, states plaintiff, the ALJ cannot rely upon the hypothetical in his finding that jobs existed and that the plaintiff was not disabled.

In Ealy, the hypothetical asked by the ALJ to the VE was very similar to that used by the ALJ in the present case. He asked the VE to "assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings." Id. at 516. ... In the present case, there is no such special requirement, only a moderate limitation, for which substantial evidence exists. While it is true that Ealy cites, somewhat in dicta, a district court case, Edwards v. Barnhart, 383 F.Supp.2d 920, 930-31 (E.D. Mich. Aug. 5, 2005), which held that where a claimant has moderate limitations in concentration, persistence or pace, the hypothetical will never be adequate when it merely limits the claimant to simple, routine, unskilled work, this Court is unwilling to make such a jump. Other district courts in the Sixth Circuit have declined to expand Ealy to this degree. See, Jackson v. Commissioner of Soc. Sec., 2011 WL 4943966 (N.D. Ohio. Oct. 18, 2011), and Horsely v. Astrue, 2013 WL 55637 (S.D. Ohio. Jan. 3, 2013), and this Court finds their reasoning persuasive in this regard. See also, Smith–Johnson v. Commissioner of Social Security, 579 Fed. Appx. 426, 436-438 (6th Cir. 2014). The Court finds that the hypothetical question in the present case was adequate to express the limitations found by the ALJ, and that there was substantial evidence for those limitations.

Id. See also Cwik v. Comm'r of Soc. Sec., 2012 WL 1033578 at *10 (E.D. Mich. Feb 23, 2012).

This Court agrees that the position that "where a claimant has moderate limitations in concentration, persistence or pace, the hypothetical will never be adequate when it merely limits the claimant to simple, routine, unskilled work" is untenable.

The ALJ concluded that Plaintiff had "mild to moderate difficulties in maintaining concentration, persistence or pace" and that is consistent with the medical record. (Docket Entry No. 20 at 31, 400, 1134, 1136, 1140). It was not error for the ALJ to omit this restriction from the hypothetical offered to the vocational expert. Further, even if the ALJ had included the limitation suggested by Plaintiff, the ALJ concluded that Plaintiff did not have "any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months" until

October 1, 2011. The ALJ determined that Plaintiff was disabled as of October 1, 2011 and this date was based on the findings of an MRI. As discussed above, there is no basis for extending Plaintiff's disability to any other date. As such, whether the questioning to the vocational expert contained every limitation is not relevant.

Accordingly, the Court concludes that the ALJ's decision was supported by substantial evidence. As such, Plaintiff's motion for summary judgment (Docket Entry No. 24) should be **DENIED**.

An appropriate Order is filed herewith.

**ENTERED** this the ___7___ day of _July_, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge